**EXHIBIT 1**

## Michael T. Ryan

**From:** Richard Castiglioni [rcastiglioni@dmoc.com]
**Sent:** Wednesday, May 05, 2004 3:36 PM
**To:** Michael T. Ryan; 'Peter Clark'
**Cc:** Jonathan Shapiro
**Subject:** FW: Rotheiser

FYI

-----Original Message-----
From: Jonathan Shapiro
Sent: Wednesday, May 05, 2004 2:24 PM
To: Richard Castiglioni
Subject: RE: Rotheiser


Jordan suffered a setback in his treatment. He had an extremely bad reaction to his first chemo treatment resulting in its suspension. He is currently in the process of recovering from the attack, but is very weak as a result. He is scheduled to resume new treatment on May 19. Given his current condition and the reaction he had to his treatment, he does not want to propose any possible dates until after his May 19th appointment.

-----Original Message-----
From: Richard Castiglioni
Sent: Wednesday, May 05, 2004 1:10 PM
To: 'Michael T. Ryan'
Cc: Jonathan Shapiro
Subject: RE: Rotheiser

I'm checking. Is Friday's hearing definitely off?

-----Original Message-----
From: Michael T. Ryan [mailto:MTRyan@RRJD-LAW.com]
Sent: Wednesday, May 05, 2004 12:51 PM
To: Richard Castiglioni
Subject: RE: Rotheiser

When is he available?

-----Original Message-----
From: Richard Castiglioni [mailto:rcastiglioni@dmoc.com]
Sent: Wednesday, May 05, 2004 12:43 PM
To: Michael T. Ryan
Cc: Jonathan Shapiro; Peter D. Clark (E-mail)
Subject: RE: Rotheiser


The expert is not available on that date

-----Original Message-----
From: Michael T. Ryan [mailto:MTRyan@RRJD-LAW.com]
Sent: Wednesday, May 05, 2004 10:14 AM
To: rcastiglioni@dmoc.com; jshaprio@dmoc.com
Subject: Rotheiser

Dear Rich:

I've checked everyone's calender. We'd like to depose Rotheiser on May 19, 2004, 10:00 am. Please confirm date and location. Thanks.

> Michael T. Ryan
> Ryan, Ryan, Johnson & Deluca, LLP

1

# Michael T. Ryan

| | |
|---|---|
| **From:** | Richard Castiglioni [rcastiglioni@dmoc.com] |
| **Sent:** | Thursday, May 20, 2004 1:42 PM |
| **To:** | Michael T. Ryan; Richard Castiglioni; jshaprio@dmoc.com; 'Peter Clark' |
| **Cc:** | chan@robsonferber.com |
| **Subject:** | RE: Rotheiser |

```
He is available for deposition on June 1,3 or 4.

-----Original Message-----
From: Michael T. Ryan [mailto:MTRyan@RRJD-LAW.com]
Sent: Wednesday, May 05, 2004 10:14 AM
To: rcastiglioni@dmoc.com; jshaprio@dmoc.com
Subject: Rotheiser

Dear Rich:

I've checked everyone's calender. We'd like to depose Rotheiser on May
19,2004, 10:00 am. Please confirm date and location. Thanks.

> Michael T. Ryan
> Ryan, Ryan, Johnson & Deluca, LLP
> P.O. Box 3057
> 80 Fourth Street
> Stamford, CT  06905
> (203) 357-9200
> Fax:  (203) 357-7915
> email: mtryan@rrjd-law.com
> <www.rrjd-law.com>
>
> The information contained in this email message is attorney/client
privileged, and/or confidential or proprietary, or trade secret information
intended only for the use of the individual or entity named above. If the
reader of this message is not the intended recipient, or the employee or
agent responsible to deliver it to the intended recipient, you are hereby
notified that any dissemination, distribution or copying of this
communication is strictly prohibited. If you have received this
communication in error, please immediately notify us by telephone at the
above number.
>
>
>
>
>
>
```

1

EXHIBIT 2

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | |
|---|---|
| PARFUMS DE COEUR, LTD. : | |
| : | |
| Plaintiff, : | |
| : | |
| V. : | CIVIL ACTION NO. 3:02 cv 1454 (RNC) |
| : | |
| LE PAPILLON, LTD. : | |
| : | |
| Defendant : | MAY 7, 2004 |

## REQUEST FOR INSPECTION

Pursuant to Rule 34 of the Federal Rules of Civil Procedure, the defendant in the captioned matter hereby requests that it be permitted to inspect the tool or mold at issue in this matter on June 11, 2004 at 10:00 a.m. or on such other date and at such other time as may be agreed upon by counsel. The scope and manner of the inspection would include inspection, measurement and photographs of the mold or tool and the core pins. The inspection would be done at Lumelite Plastics in the presence of a Lumelite or Parfums representative or both. Any measurements taken would be taken by Lumelite representatives, using their measuring equipment, including an optical comparator, micro-vu system and calipers. If any costs are incurred by Lumelite in taking the measurements, the defendant agrees to pay for them. The defendant will provide the plaintiff with the measurements and any photographs taken. The

inspection will be attended by representatives of the defendant, including the undersigned, as well as co-counsel, Robert Chan, Watson Warriner and the defendant's consultants.

                      THE DEFENDANT,
                      LE PAPILLON, LTD

By: _____
Michael T. Ryan, Esq., (CT 05685)
Ryan, Ryan, Johnson & Deluca, LLP
80 Fourth Street, P.O. Box 3057
Stamford, CT  06905
Phone No. 203-357-9200

## CERTIFICATE OF SERVICE

I hereby certify that on May 7, 2004, a copy of the above was mailed to the following counsel and pro se parties of record:

Richard E. Castiglioni, Esq.
Diserio, Martin, O'Connor & Castiglioni
One Atlantic Street
Stamford, CT 06901
Attorney for Plaintiff, Parfums de Coeur, Ltd.

Robert N. Chan, Esq.
Robson, Ferber, Frost, Chan & Essner, LLP
530 Fifth Avenue
New York, NY 10036-5101
Attorney for Defendant, Le Papillon, Ltd.

Peter D. Clark, Esq.
Law Offices of Peter D. Clark
525 Bridgeport Avenue
Shelton, CT 06484

_____
Michael T. Ryan, Esq.

I:\Procases\720.123\inspection.wpd
720.123

- 3 -

EXHIBIT 3

Case 3:02-cv-01454-RNC   Document 81-2   Filed 06/14/2004   Page 8 of 11

*Rotheiser Design Incorporated   1755 Lake Cook Road-325   Highland Park, Illinois 60035   Telephone 847 579.0043*

March 31, 2004

Diserio Martin O'Connor & Castiglioni LLP
One Atlantic Street
Stamford, Connecticut 06901-2402

Dear Mr. Castiglioni and Mr. Shapiro:

    Re:    <u>Expert Report Regarding Parfums de Coeur v. LePapillon</u>

At your request, I have prepared the following report summarizing my opinions regarding the quality, condition and maintenance of the molds and subsequent measures taken by LePapillon upon discovery of the failure of the fitments.

## I. Qualifications

1. My name is Jordan I. Rotheiser. I live in Highland Park, Illinois. I am an expert and consultant in the fields of industrial design, plastic product design engineering, injection molding and tooling design and have my own consulting firm, Rotheiser Design, Inc. I have been retained as an expert in this case by Parfums de Coeur.

2. A copy of my resume is attached as Exhibit A. I have a B.S. degree in Industrial Engineering and a B.F.A. in Industrial Design. I have worked in the plastics field since 1960 and have worked for Fisher Body, Abbott Laboratories and Raymond Loewy (Paris), as well as with Rotheiser Design. I have been in the design and development of plastics molded products and packaging throughout my career.

3. I am a professional member of the Industrial Design Society of America. I served on the Board of Directors of the Chicago Chapter for several years. I wrote the Industrial Design section for the *American Educators Encyclopedia*, American Educators, Inc. (1963) and for the *Handbook of Plastics Material and Technology*, John Wiley & Sons, NY (1990), a leading handbook for plastics design engineers. I have practiced plastics engineering and industrial design since 1960.

4. I have been a member of the Society of Plastics Engineers (SPE) since 1960 and have held various positions as a Director, Councilor, and Chairman of a division and various programs of the organization over the years. I was elected a Fellow of the SPE in 2000. I have received several awards from the SPE for professional development and was elected a member of the Plastics Pioneers Association in 2001. I have authored numerous articles in my field, and also presented numerous seminars and papers, written a book entitled *Joining Plastics, Handbook for Designers and Engineers*, Hanser Gardner, (1999), and have been a contributor to handbooks in the plastics field. Specifically, I wrote the Plastics Design chapter in the *Modern Plastics Handbook*, McGraw Hill (1999) and the Plastics chapter in the *Handbook of Materials for Product Design*, McGraw-Hill (2001). I have been teaching plastics design since 1981 and have taught 98 seminars to date. I am also an inventor on seven U.S. patents. I have been an expert witness in several litigation cases in the plastics field. My curriculum vitae is attached as Exhibit A.

## II. Background

5. In the past four years, I have been deposed in four lawsuits:

Case:    <u>Mark A. Freeman, et al. v. Gerber Products Company</u>

1

| | |
|---|---|
| Matter: | Patent Infringement |
| Case: | ADC Telecommunications, Inc. v. Panduit Corp. |
| Matter: | Patent Infringement |
| Case: | Plastics Research Corp., Inc. v. Brite-Millwork, Inc., Avon Plastics, Inc., Weyerhauser USA, Inc. |
| Matter: | Patent infringement |
| Case: | Don De Cristo Concrete v. American Allsafe Company, Inc., Flex-O-Lite, Inc. and Jackson Products, Inc. dba Services & Materials Company |
| Matter: | Patent infringement |

Compensation: I am being compensated at the rate of $200 per hour.

### III. Summary of Work Done

6.  I have reviewed Defendant's Objections and Answers to Plaintiff's Interrogatories and Request for Production, Melick, Therese Problem File, Kaufman Container – J. Bartlett PSC, Ken Primer-Development File, the Bonne Bell file, the depositions of Ray Severa, Therese M. Butler-Melick, Kenneth Primer and James Storer and accompanying exhibits.

### IV.   Opinions

7.  It is my opinion that LePapillon was derelict in not determining the quality of the mold before placing its product in the marketplace. The part manufacturer has an obligation to provide a product that will perform its function properly. To do so on a continuous basis, the mold must be built to quality standards that can assure that the size of the parts will be consistent and not vary so much that the quality of the product will suffer. LePapillon failed to establish that the quality of the mold was such that it would produce parts that would function properly on a continual basis. Core dimensions were first measured by their consultant, James Storer, in October 2001. Cavity dimensions were not measured even then.

8.  It is my opinion that LePapillon was derelict in not determining the condition of the mold before purchasing it and placing its product in the marketplace. The part manufacturer has an obligation to provide a product that will perform its function properly. To do so on a continuous basis, the mold must be maintained in good condition or the size of the parts will vary so much that the quality of the product will suffer. LePapillon failed to establish that the condition of the mold was such that it would produce parts that would function properly.

9.  It is my opinion that LePapillon was derelict in producing parts of widely varying retention dimensions from a mold with widely varying core dimensions thus resulting in parts with wide variances in ball retention strength resulting in failure of some of the fitments. The part manufacturer has an obligation to provide a product that will perform its function properly. LePapillon made no effort to establish quality control procedures that would assure the customer that the parts were manufactured within specifications.

10.  It is my opinion that LePapillon was derelict in selling product that did not meet its own specifications and that it was impossible to produce parts within specification due to the wide variation in core dimensions. LePapillon was in possession of the original Covipak drawing which contained the tolerance specifications for the fitment. It is not possible for the core pins measured by Mr. Storer to consistently make parts within the tolerances specified on the Covipak drawing. It is customary for the mold to be built and maintained to a tolerance one-third that of the part; the balance of the tolerance to allow for processing variations. (Mr. Storer has confirmed this custom by specifying +.001/-.000 for this

2

dimension on his A-1001 drawing) By this standard, fourteen of the twenty-two measured cavities are out of tolerance (64%). That assumes, of course, that the .400 in. dimension is the correct dimension to allow for proper shrinkage in the first place.

11. It is my opinion LePapillon was further derelict in creating a drawing (A-1001) with a new specification that matched what the mold was actually producing without investigating whether the new specification would produce a fitment that would not result in balls popping out of the fitment. The original specification called for a retention differential of 0.012 ± .004 in., (.398 ±.002 ball diameter minus .387 ± .002), the new specification called for a retention differential of only 0.009 ±.004 in. (.400 ±.002 ball diameter minus .391 ± .002 fitment dimension); a drop to only 75% of the original specification. The drop would have been greater ( to 58%) had the ball diameter not been increased. Clearly the mold would not produce parts within the original tolerance specifications and the specifications had to be adjusted accordingly. Furthermore, the core pins had to be rebuilt in order to meet the new specifications.

12. It is my opinion that Le Papillon attempted to adjust the design to match the mold, however a badly flawed drawing resulted in an impossible design specification. Tolerancing on the new specification permitted the complete elimination of retention differential resulting in a potential combination of dimensions whereby the ball would simply fall out of the fitment with no pressure at all. On drawing A-1001, the opening is specified as .391 ±.002 in., permitting the opening to be as large as .393 in. The diameter below has a .199 in radius (mislabeled as a diameter according to Mr. Storer's testimony) which carries a drawing tolerance (lower right corner) of ±.005 in. That makes the tolerance on the .398 in diameter ±.010 in. This tolerance permits the .398 in. diameter to be a small as .388 in., which is .005 in. less than the largest permissable opening. In other words, this specification permits the retention of the ball to be eliminated entirely.

13. It is my opinion that LePapillon was derelict in not informing its customers that failure was occuring with the product. The part manufacturer has an obligation to provide a product that will perform its function properly. When the occasion arises that the part manufacturer becomes aware that the product is failing, he has an obligation to inform his other customers of the problem. LePapillon was aware that the roller balls were coming out of the fitment in the spring of 2001 and failed to inform Parfums in time for appropriate measures to be taken. When a customer requests assistance from the part manufacturer, there is a duty of the part manufacturer to investigate and candidly share its findings with the customer.

14. It is my opinion that LePapillon was derelict in not sharing the failure information with the consultant.

I reserve the right to supplement this report as discovery continues.

Respectfully submitted,

*Jordan I. Rotheiser*

Jordan I. Rotheiser

3