UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

PARFUMS DE COEUR, LTD.                    :
                                          :
            Plaintiff,                     :
                                          :
    V.                                     :    CIVIL ACTION NO. 3:02 cv 1454 (RNC)
                                          :
LE PAPILLON, LTD.                          :
                                          :
            Defendant.                     :
                                               OCTOBER 22, 2004

## JOINT TRIAL MEMORANDUM

Pursuant to the Local Rules of Civil Procedure and this District's Standing Order

regarding Trial Memoranda in Civil Cases, the defendant submits its portion of the Joint Trial

Memorandum. Defendant has asked plaintiff to provide its portion of the Joint Trial

Memorandum so that defendant could respond and submit a "joint" memorandum as required by

the Local Rules. Plaintiff, however, has failed to do so, so defendant is forced to file its

submission without knowing what witnesses, evidence, claims and conclusions of law plaintiff

intends to present in its case. This procedure has prejudiced the defendant in the preparation and

presentation of the case and defendant therefore respectfully requests that the case be dismissed.

If not dismissed, defendant reserves the right to supplement its portion of the Joint Trial

Memorandum after receipt of plaintiff's portion.

(1)    **TRIAL COUNSEL**:

Richard E. Castiglioni, Esq., DISERIO, MARTIN, O'CONNOR & CASTIGLIONI, One

Atlantic Street, Stamford, CT 06901, 203-358-0800, for Plaintiff, Parfums de Coeur, Ltd.

Michael T. Ryan, Esq., RYAN, RYAN, JOHNSON & DELUCA, LLP, 80 Fourth Street,

Stamford, Connecticut 06905 (203) 357-9200 and Robert N. Chan, Esq., FERBER FROST

CHAN & ESSNER, LLP, 530 Fifth Avenue, New York, NY 10036-5101, 212-944-2200, for

Defendant, Le Papillon, Ltd.

Peter D. Clark, Esq., LAW OFFICES OF PETER D. CLARK, 525 Bridgeport Avenue,

Shelton, CT 06484, 203-925-9688, for Defendant on the Counterclaim, Parfums de Coeur.

(2)    **JURISDICTION**:  Diversity of citizenship.

(3)    **JURY/NON-JURY**:  This is a non-jury case.

(4)    **NATURE OF CASE**:

A.    **The Complaint**

First Count:  Breach of Contract in which plaintiff alleges that defendant breached terms

contained on the reverse side of a document which plaintiff unilaterally sent to defendant *after*

the parties had reached a meeting of the minds as to the material terms of their agreement (which

contained none of the terms plaintiff alleges were breached), *after* plaintiff had confirmed that

agreement in writing and *after* defendant had begun to perform the parties' agreement.

Damages Claimed: Increased general liability insurance costs, estimated increased insurance costs for future years, estimated future costs for resolving products liability claims, approximately $15,000 paid by plaintiff to settle and service products liability claims, approximately $22,000 in costs for reworking its own product and machinery, $48,000 for disposing of its unwanted inventory, and in excess of $400,000 in attorneys' fees.

Second Count: Breach of Express Warranty that defendant's product "conforms to specifications and is suitable for [plaintiff's] intended use." That alleged warranty was contained in the document referred to above which plaintiff sent to defendant after the parties had entered into their agreement and which was neither read nor agreed to by defendant. At the time of the alleged warranty, plaintiff had neither advised defendant of the use it intended to make of defendant's product nor provided any specifications to defendant.

Damages Claimed: Same as for Count One.

Third Count: Breach of Implied Warranty of Merchantability.

Damages Claimed: Same as for Count One.

Fourth Count: Breach of Implied Warranty of Fitness.

Damages Claimed: Same as for Count One.

Fifth Count:  Contractual Indemnification based on an indemnity provision contained in the document referred to above which plaintiff sent to defendant after the parties had entered into their agreement and which was neither read nor agreed to by defendant.

Damages:  Declaratory judgment.

Sixth Count:  Contribution.  Defendant's objection to the Sixth Count was sustained by Magistrate Judge Martinez.

Seventh Count:  CUTPA

Damages Claimed:  Attorneys' fees and punitive damages of $1,000,000

**B.    The Answer**

Defendant denies the material allegations of the complaint, and asserts the following affirmative defenses:

First:  The complaint fails to state a claim upon which relief may be granted.

Second:  Plaintiff's claims are barred by the doctrines of waiver and estoppel.

Third:  Plaintiff never informed defendant, prior to defendant's delivery of roller ball assemblies to plaintiff that plaintiff intended to use these assemblies in a flexible container.

Fourth:  Plaintiff, prior to ordering roller ball assemblies from defendant, failed to investigate whether these assemblies could function properly on a flexible container.

–4–

Fifth:  Plaintiff failed to mitigate its damages.

Sixth:  The CUTPA claim is barred by the statute of limitations.

**Counterclaim**: Defendant seeks indemnification for any fees, judgments or other consequential damages resulting from claims asserted against defendant by customers of plaintiff who were injured by plaintiff's product.

(5)    **STIPULATION OF FACTS AND LAW**: The parties have not stipulated to any facts or law.

(6)    **PLAINTIFF'S CONTENTIONS**:  Defendant's understanding of plaintiff's contentions are those outlined in plaintiff's First Amended Complaint.

(7)    **DEFENDANT'S CONTENTIONS**:  Plaintiff seeks to blame defendant for the failure of a package plaintiff designed and failed to adequately test.  Plaintiff's package had the following constituents: a) a butterfly-shaped flexible plastic bottle which plaintiff designed and had manufactured, b) an alcohol-based perfume infused with metallic glitter which plaintiff purchased from a supplier, c) an off-the-shelf roller ball fitment (the "fitment") which plaintiff purchased from defendant to go on top of the bottle and dispense the perfume, and d) a cap which went on top of the fitment and which plaintiff purchased from yet another supplier.  Plaintiff retained Knowlton Packaging to fill the bottles, put the constituent parts together and perform

some rudimentary tests. In defiance of established industry practice, plaintiff did not thoroughly

test the resulting package. Although the alcohol-based metallic-glitter-infused perfume was

classified by the United States Government as an eye irritant and plaintiff intended to market its

product to young girls, it did not affix a warning label to its product and never bothered to

establish a recall procedure.

The ordinary purpose of the fitments is to dispense a gravity fed product through rolling

action. The fitments, which sell for approximately $.017 each, are designed to be used on a stiff

bottle to dispense deodorant, lip gloss or make-up where it is desired that a thin film of the

product be applied to a consumer's skin. With the single exception of plaintiff's radical and

irresponsible usage, the fitments have never been used with a bottle in which internal pressure

might build up without a means of release. Not only is the fitment not designed to withstand

excess pressure, but also pressure impedes its function by interfering with the rolling of the roller

ball. The bottle designed by plaintiff built up pressure when squeezed, or heated, and, by reason

of its design, invited its young customers to squeeze it.

Plaintiff did not a) test its package for roller ball retention under pressure, b) advise

defendant that it intended to use the fitments with a flexible bottle, c) provide defendant with any

specifications for ball retention, d) ask for defendant's advice or opinion when it designed its

package, e) advise defendant that it intended to use the fitments with a flexible bottle or f) inquire as to the amount of pressure the $.017 fitments were designed to withstand. Defendant had no way to anticipate that plaintiff intended to radically misuse its product, or that it would, in defiance of established industry practice and common sense, put its product on the market without adequate testing or required warning labels.

Prior to any transaction between plaintiff and defendant, plaintiff purchased approximately a million fitments from a Canadian company known as Covipak, and plaintiff used them on its original package without problem or complaint. Plaintiff did not supply Covipak with any specifications for the fitments, instead it examined and then approved samples Covipak produced. After Covipak went bankrupt and defendant purchased the mold that Covipack had used to make the fitments, plaintiff approached defendant to order the same type of fitments it had previously purchased from Covipak.

On or around February 16, 2001, plaintiff and defendant reached an oral agreement as to all material terms of the transaction. On February 21, Plaintiff confirmed this agreement by faxing a purchase order dated February 16 which contained all of the material terms of the parties' agreement (the "Purchase Order"). The Purchase Order, which was signed by plaintiff, indicated that it was binding on plaintiff as is, contained no reference to there being additional

terms to the parties' contract other than those on the face of the Purchase Order and was blank on

its reverse side. It also stated that there were no specifications for the fitments ordered. On

February 22, defendant, in accordance with industry practice, issued its internal purchase order

and began working on filling the order.

Subsequently, defendant received from plaintiff a mailed copy of the Purchase Order, but

this copy, unlike the faxed copy which had served to confirm the parties' agreement, had

additional terms on its reverse side which had never been discussed or agreed to by the parties.

Defendant never read the reverse side of the mailed copy as the faxed copy constituted the

parties' contract and defendant had already begun performing on the contract prior to its receipt

of the mailed copy. The additional terms on the back of the mailed copy form the entire basis for

plaintiff's claims of breach of contract, breach of express warranty and contribution, counts one,

two and five.

Between February and July of 2001, plaintiff received at least four complaints that its

young customers had sustained serious eye injuries when pressure built up inside its bottle and

caused the roller ball and the toxic fill to be expelled with force. After receiving such

complaints, plaintiff asked Knowlton Packaging to perform additional tests. Those tests revealed

that when the bottle was squeezed the roller ball and the toxic contents would fly out, sometimes

with considerable force. As part of its testing, Knowlton measured the pressure at which roller balls would be expelled from the fitments and measured the area of the fitment responsible for ball retention. Obviously, the consistency of the fitments' retention diameters and the extent to which the fitments retained roller balls under pressure was acceptable to plaintiff as plaintiff continued to market, manufacture and sell its product after receiving the results of Knowlton's tests. Indeed plaintiff, after receiving and testing the fitments, never, in the course of the parties' business relationship, rejected a single one of them.

Thereafter, each of the four senior officers of plaintiff, performing their own tests, squeezed the bottle with light to moderate pressure and expelled the roller ball and fill. Yet plaintiff blithely continued to manufacture, market and ship its product and did not even bother to affix warning labels to it.

On August 2, 2001, Randy Wheaton, plaintiff's vice president, sent a letter to Mark Rosso of Le Papillon suggesting "We need to come up with a game plan on how to modify this roller ball system to lock the ball in place for future runs." Although plaintiff knew that its customers were being injured, plaintiff expressed no urgency and did not ask for defendant's assistance in solving the present problem, its only expressed concern was for "future runs."

Plaintiff did not advise defendant of its customers' injuries until January of the following year, and did not make any further inquiries of defendant between August and January.

In March of 2002, defendant, concerned that plaintiff intended to continue to sell its dangerous product, sold the mold that produced the fitments to plaintiff for $1. Although plaintiff now claims, based on virtually no evidence, that the mold that produced the fitments was defective, plaintiff is still using the mold to produce fitments, and, because it has ceased using a flexible bottle, has ceased to have problems.

Although plaintiff advances a variety of unsubstantiated claims to the effect that defendant or the molder of the fitments had poor quality control or produced inconsistent parts, there is no evidence that any of the consumer injuries resulted from defective or inconsistent fitments. Instead they all resulted from excessive pressure having been built up inside the package improvidently designed by plaintiff. In truth the mold produced remarkably consistent parts.

The basis of plaintiff's CUTPA claim is the allegation that in late June or early July 2001 defendant received a complaint from another customer, Bonne Bell, that roller balls were being sucked out of fitments by a vacuum assist that Bonne Bell was using on its assembly line. Bonne Bell never determined the amount of vacuum pressure that its production line applied to the

fitments to suck out the ball. Ultimately, Bonne Bell's problem was solved by using a larger ball, but, as plaintiff's tests showed, that fix would not have ameliorated the problem plaintiff was experiencing due to pressure build up in its improvidently designed bottles.

Plaintiff contends it was an unfair and deceptive trade practice for defendant not to have advised plaintiff of the situation at Bonne Bell. However, the Bonne Bell situation was unrelated to the problem that was causing injuries to plaintiff's customers. Moreover, if defendant had told plaintiff about the Bonne Bell situation, plaintiff would not have learned any material facts which it did not already know. Plaintiff had known of eye injuries sustained by its customers as early as February of 2001 and that roller balls and toxic fill would be expelled if the bottle was squeezed, and it had even done tests that established amount of pressure needed to expel the roller balls. Moreover, the solution for the Bonne Bell problem was tried by plaintiff and did not work for it. If plaintiff were told that the roller balls could be sucked out of the fitments by a vacuum assist, what would that have added in terms of relevant information? Plaintiff does not say.

Although plaintiff now seeks to charge defendant with the increased insurance costs it sustained since 2002, those increases were entirely due to a hardening in the insurance market subsequent to 9/11 and plaintiffs own irresponsible conduct. On April 30, 2002, plaintiff received notice that its carrier, Travelers, was not renewing its insurance because it "has become

−11−

aware of the fact that your company has materially changed by manufacturing new products (scented candles and a product line of fragrance for children)." In addition Travelers complained about plaintiff's failure to affix warning labels and lack of a recall procedure. Ultimately plaintiff chose to purchase general liability insurance but to self-insure for products liability. This turned out to be a provident decision, because plaintiff has to date paid less than $18,000 to settle and defend such claims. As this is less than it would have had to pay for products liability insurance it, rather than sustaining a loss, has incurred a profit.

Defendant contends that it is entitled to indemnification for any costs and expenses that it has incurred or will incur as a result of claims brought against it by plaintiff's consumers. The customers' injuries resulted not because of anything defendant did or failed to do but rather because plaintiff failed to properly design and test its product and failed to take remedial action when it learned that its product was causing serious injury.

(8)  **LEGAL ISSUES**:

a)  After a contract has been entered into, is it amended when one party unilaterally mails the other party an additional copy of the contract with new terms printed on its reverse side, when the parties never discussed those terms, the party seeking to enforce those terms never called the other party's attention to them and the party sought to be charged never saw them?

b)      Is an express warranty created when the party seeking to impose the warranty unilaterally

mails to the other party a copy of the parties' contract with new warranty terms printed on its

reverse side when the parties never discussed those terms, the party seeking to enforce those terms

never called the other party's attention to them and the party sought to be charged never saw

them?

c)       Is a product of merchantable quality if it is fit for the purpose for which it is ordinarily

used?

d)      Can a manufacturer be charged with failing to produce its product in accordance with

contract specifications if there are no specifications contained in the contract?

e)      Is a drawing a contract specification if it is produced after a contract is entered into, is not

mentioned in the contract and provides that it is "subject to first production evaluation."

f)      Is a seller who warrants that his product is suitable for the purchaser's intended uses and

purposes in the ordinary course of his business liable when the purchaser unbeknownst to the

seller makes a radical misuse of the product?

i) Is a seller who warrants that his product is suitable for the purchaser's intended uses

and purposes in the ordinary course of his business liable when the purchaser, after

reordering the product and expressing its satisfaction with the product, unbeknownst to

the seller makes a radical misuse of the product?

g)    Is an implied warranty of fitness for a particular purpose breached when a purchaser does not disclose its intended use of the product and the intended use is unusual and dangerous?

h)    Is defendant liable for damages caused by plaintiff's own conduct?

i)    Is a party liable for attorneys' fees or for punitive damages under CUTPA if it did not engage in an unfair or deceptive act or practice?

j)    Is plaintiff's CUTPA claim barred by the statute of limitations?

k)    Are increased insurance premiums legally cognizable damages under a breach of contract claim where the amount, if any, that is attributable to the defendant's conduct is speculative?

l)    Is plaintiff entitled to recover damages based on unpredictable future events?

m)    Is plaintiff entitled to recover damages if it cannot prove loss causation?

n)    Is defendant liable for costs plaintiff incurred because it unilaterally decided to rework its product or tooling?

o)    Is defendant liable for plaintiff's inventory costs which were incurred because plaintiff designed a dangerous or unworkable product?

p)    Are legal fees in excess of $400,000 reasonable on a claim where actual damages are a fraction of that amount?

q)   Is plaintiff entitled to recover damages where it made a profit rather than sustained a loss?

r)   Is defendant entitled to indemnification for costs resulting from plaintiff's misconduct?

(9)   **VOIR DIRE QUESTIONS**: Not applicable.

(10)   **LIST OF WITNESSES**:

**Plaintiff's Witnesses**

Unknown.

**Defendant's Witnesses**

Without knowing what witnesses plaintiff intends to call at trial it is difficult for defendant to disclose the witnesses it intends to call. The defendant reserves the right to call any of the following witnesses and to amend and/or supplement this portion of the Joint Trial Memorandum after receipt of plaintiff's portion:

1.   **Watson Warriner**, President, Le Papillon, Ltd., 120 Albany St., New Brunswick, N.J. Mr Warriner may be called to rebut the plaintiff's claims; to explain the facts and circumstances concerning the sale of goods to the plaintiff and the facts alleged in the complaint; and to address any other matters raised by plaintiff in its portion of the Joint Trial Memorandum.

2.   **Mark Rosso**, Le Papillon. Mr. Rosso may be called to rebut plaintiff's claims; to testify as to his involvement in the sale of goods to the plaintiff; to testify about his discussions with plaintiff; and to address any other matters raised by plaintiff in its portion of the Joint Trial Memorandum.

3.   **Timothy Hagerty,** Le Papillon. Mr. Hagerty may be called to rebut plaintiff's claims; to
     testify as to his involvement in the sale of goods to the plaintiff; to testify about his
     discussions with plaintiff; and to address any other matters raised by plaintiff in its portion
     of the Joint Trial Memorandum.

4.   **Luc Duchesne,** 18 Ch es Merlettes, Boisbriand, Qc J7G 3K2. Mr. Duchesne may be
     called to rebut plaintiff's claims; to testify as to his involvement in the sale of goods to the
     plaintiff; to testify about his discussions with plaintiff; and to address any other matters
     raised by plaintiff in its portion of the Joint Trial Memorandum.

5.   **Guy Mercier,** 23 LaFlamme, St-Damien. Mr. Mercier may be called to rebut claims made
     by the plaintiff concerning the existence of specifications for the parts in question;
     concerning maintenance of the mold; and concerning modifications allegedly made to the
     mold. Defendant also reserves the right to call this witness to rebut any other claims made
     by plaintiff in its portion of the Joint Trial Memorandum.

6.   **Daniel LaBonte,** 6475 avenue fabre, Charlesbbourg. Mr. Labonte may be called to rebut
     claims made by the plaintiff concerning the existence of specifications for the parts in
     question, concerning maintenance of the mold and concerning modifications allegedly
     made to the mold. Defendant also reserves the right to call this witness to rebut any other
     claims made by plaintiff in its portion of the Joint Trial Memorandum.

7.   **Michael Shepherd,** 85 Charles Coleman Blvd., Pawling, N.Y. Mr. Shepherd may be
     called to testify concerning his observations and measurements of the mold in question;
     concerning the condition of the mold; concerning changes Lumelite made to the mold; and
     his involvement with trying to solve plaintiff's ball retention problems. Defendant also
     reserves the right to call this witness to rebut any other claims made by plaintiff in its
     portion of the Joint Trial Memorandum.

8.   **Robert Rosso,** 85 Charles Coleman Blvd., Pawling, N.Y. Mr. Rosso may be called to
     testify concerning his observations and measurements of the mold in question; concerning
     the condition of the mold; concerning changes Lumelite made to the mold; and his
     involvement with trying to solve plaintiff's ball retention problems. Defendant also

reserves the right to call this witness to rebut any other claims made by plaintiff in its portion of the Joint Trial Memorandum.

9.     **Joseph W. Pietryka,** 85 Charles Coleman Blvd., Pawling, N.Y.  Mr. Pietryka may be called to testify concerning his observations and measurements of the mold in question; concerning the condition of the mold; concerning changes Lumelite made to the mold; and his involvement with trying to solve plaintiff's ball retention problems.  Defendant also reserves the right to call this witness to rebut any other claims made by plaintiff in its portion of the Joint Trial Memorandum.

10.    **Mark Laracy,** 85 Old Kings Highway North, Darien, CT. Defendant anticipates that plaintiff will call Mr. Laracy as a witness at trial.  Defendant reserves the right to cross examine Mr. Laracy and to call him as a witness if the plaintiff does not to rebut the claims made by the plaintiff and to testify concerning the facts and circumstances alleged in the complaint.

11.    **Randy Wheaton,** 85 Old Kings Highway North, Darien, CT. Defendant anticipates that plaintiff will call Mr. Wheaton as a witness at trial.  Defendant reserves the right to cross examine Mr. Wheaton and to call him as a witness if the plaintiff does not to rebut the claims made by the plaintiff and to testify concerning the facts and circumstances alleged in the complaint.

12.    **John J. Nilla,** 85 Old Kings Highway North, Darien, CT. Defendant anticipates that plaintiff will call Mr. Nilla as a witness at trial.  Defendant reserves the right to cross examine Mr. Nilla and to call him as a witness if the plaintiff does not to rebut the claims made by the plaintiff and to testify concerning the facts and circumstances alleged in the complaint.

13.    **Edward Kaminski,** 85 Old Kings Highway North, Darien, CT. Defendant anticipates that plaintiff will call Mr. Kaminski as a witness at trial.  Defendant reserves the right to cross examine Mr. Kaminski and to call him as a witness if the plaintiff does not to rebut the claims made by the plaintiff and to testify concerning the facts and circumstances alleged in the complaint.

14.  **Barry Dyball,** 42 Pine Street, Knowlton, Quebec. Mr. Dyball may be called to testify concerning his discussions with plaintiff; actions he took in response to notice of problems with plaintiff's product; regarding the development of the Glitter Critter and butterfly packages; regarding Knowlton's involvement in the development and production of the product; regarding deliveries of the finished product by Knowlton and regarding certain records prepared by Knowlton.

15.  **Therese Marie Butler-Melick,** 2363 Sandlewood Dr., Twinsburg, OH. Ms. Melick may be called to testify concerning her knowledge of the problems at Bonne Bell and actions taken to solve the problems.

16.  **Raymond Severa,** 3172 South Windsor Court, Westlake, OH. Mr. Severa may be called to testify concerning his knowledge of the problems at Bonne Bell and actions taken to solve the problems.

17.  **Kenneth Primer,** Kaufman Container Company. Mr. Primer may be called to testify concerning his knowledge of the problems at Bonne Bell and actions taken to solve the problems.

18.  **Representatives of TricorBraun,** 1050 Wall Street West, Lyndhurst, NJ. Defendant may call representatives of Tricor Braun to testify concerning their discussions with plaintiff during the development of the Glitter Critter and butterfly packages.

19.  **Patricia Hill,** 25 Knoll Dr., Hamden, CT. Ms. Hill may be called to testify concerning the facts and circumstances concerning the cancellation of plaintiff's general and excess liability insurance and concerning statements made by the plaintiff. She may also be called to testify concerning plaintiff's failure to renew its insurance in July 2002.

20.  **Representatives of Charter Oak Fire Insurance Company,** Hartford, CT. Representatives of Charter Oak Fire Insurance Company may be called to testify concerning the facts and circumstances concerning the cancellation of plaintiff's general

and excess liability insurance and concerning statements made by the plaintiff. They may also be called to testify concerning plaintiff's failure to renew its insurance in July 2002.

21.  **Ronald Schumitz,** Craig M. Ferguson & Company, Inc., Holly Pond Plaza, 1281 Main Street, Stamford, CT. Mr. Schumitz may be called to testify regarding the facts and circumstances concerning the cancellation of plaintiff's general and excess liability insurance as well as attempts plaintiff made to obtain alternate insurance coverage and plaintiff's failure to renew its insurance. He may be called to testify concerning conversations he had with plaintiff and concerning efforts he made on plaintiff's behalf in attempting to obtain insurance.

22.  **Jay Bienstock,** 171 Dorchester Drive, East Windsor, NJ 08520. Mr. Bienstock is one of defendant's expert witnesses and is expected to testify in accordance with his disclosure, his expert report as well as the testimony he has given at deposition.

23.  **Joseph Patrick McFadden, Sr.,** McFadden CAE Services, 157 Nonopoge Rd., Fairfield, CT 06430. Mr. McFadden is one of defendant's expert witnesses and is expected to testify in accordance with his disclosure, his expert report as well as the testimony he has given at deposition.

24.  **Gary Bausom,** Bausom & Associates, Inc., 1331 Danville Blvd., Alamo, CA 94507. He is one of defendant's experts and expected to testify in accordance with his disclosure and his report.

(11)  **EXHIBITS**:

**Plaintiff's Exhibits**

Unknown.

**Defendant's Exhibits**

The defendant reserves the right to introduce any of the following exhibits and to amend and/or supplement this portion of the Joint Trial Memorandum after receipt of plaintiff's portion:

1.    Plaintiff's Responses to Defendant's First Set of Interrogatories and Request for Production, dated January 17, 2003.

2.    Consumer complaints about cosmetic products 2000 Annual Report (Exhibit 2, Wheaton Deposition).

3.    E-mail transmission from Barry Dyball to Randy Wheaton, dated August 1, 2001.

4.    Plaintiff's Purchase Order No. 100617 to Covipak, dated May 8, 2000 and Revision 1 thereto.

5.    Plaintiff's Purchase Order No. 100762 to Covipak, dated June 6, 2000.

6.    Bulk Lot Where Used Inquiry (Bates 00402 through 00417).

7.    Fax copy of plaintiff's Purchase Order No. 110330 to Le Papillon, dated February 16, 2001 with Revision 1, Revision 2 and Revision 3.

8.    Plaintiff's teddy bear bottle (Exhibit 12, Wheaton deposition).

9.    Fax cover sheet from Knowlton with attached Material Safety Data Sheet (Exhibit 13, Wheaton deposition).

10.   Plaintiff's Responses to Defendant's Second Set of Interrogatories and Request for Production, dated June 11, 2003.

11.   Correspondence dated July 30, 2002 from Mark Laracy to plaintiff's customers as set forth in Exhibit 1 to said response to Defendant's Second Set of Interrogatories.

12. 2-page e-mail produced in response to Defendant's Second Set of Interrogatories and Request for Production, dated August 23, 2002 through August 26, 2002 concerning plaintiff being self-insured.

13. Documents produced by plaintiff in response to Interrogatories and Request for Production (Bates 00001 through 00923).

14. Claim Summary Parfums de Coeur prepared by William G. Looney (Defendant's Exhibit 4, Kaminski deposition).

15. Parfums Commercial Package Policy (Bates 00216 through 00243).

16. Parfums Excess Liability Policy (Bates 00244 through 00264).

17. Fax from Elaine Slocum to Ed Kaminski, dated March 4, 2002 (Bates 00700 through 00702).

18. Correspondence from James B. Cahill, Jr. to Ed Kaminski, dated March 26, 2002 (Bates 00775 through 00778).

19. Correspondence from James B. Cahill to Edward J. Kaminski, dated April 1, 2002 (Bates 00774 through 00778).

20. Notice of Non-Renewal, dated April 30, 2002 (Bates 00009 through 00011).

21. Correspondence from Elaine Slocum to Ed Kaminski, dated May 13, 2002 (Bates 00703 through 00706).

22. Correspondence from Elaine Slocum to Ed Kaminski, dated May 16, 2002 (Bates 00708 through 00709).

23. Correspondence dated May 16, 2002 from Ed Kaminski to Ron Schumitz (Bates 00767 through 00770).

24. Correspondence from Ed Kaminski to Bruce Rogers, dated May 16, 2002 (Bates 00716 through 00717).

25. Correspondence from Ed Kaminski to Elaine Slocum, dated May 21, 2002 (Bates 00715).

26. Insurance Proposal prepared by Craig M. Ferguson & Co., Inc. (Bates 00720 through 00730).

27. Correspondence from Elaine Slocum to Ed Kaminski, dated June 28, 2002 (Bates 00732).

28. Insurance Proposal prepared by Craig M. Ferguson & Co., Inc. (Bates 00733 through 00747).

29. Correspondence dated March 22, 2002 from Ed Kaminski to Ron Schumitz (Defendant's Exhibit 19, Kaminski deposition 2/18/03).

30. Correspondence dated May 13, 2002 from Ed Kaminski to James B. Cahill, Jr. (Defendant's Exhibit 20, Kaminski deposition 12/18/03).

31. Parfums de Coeur Loss Run (Defendant's Exhibit 21, Kaminski deposition 12/18/03).

32. Correspondence from Eileen Dwyer to Ed Kaminski, dated February 20, 2001 (Defendant's Exhibit 22, Kaminski deposition 12/18/03).

33. Correspondence from Eileen Dwyer to Ed Kaminski, dated February 20, 2001 (Defendant's Exhibit 23, Kaminski deposition 12/18/03).

34. Outstanding Roll-On Product Liability Claims/Notices (Defendant's Exhibit 24, Kaminski deposition 12/18/03).

35. Outstanding Product Liability Claims/Notices (Defendant's Exhibit 25, Kaminski deposition 12/18/03).