36. Insurance Proposals from JP Morgan Chase, dated December 11, 2002 (Bates 00899 through 00914).

37. Insurance Proposal prepared by Craig M. Ferguson & Co., revised July 2, 2002 (Bates 00751 through 00764).

38. Notes of Edward Kaminski (Bates 00796 through 00797).

39. Correspondence, dated July 9, 2002 from Ed Kaminski to Jerry McStravick and notes thereon (Bates 00799 through 00800).

40. Notes of Edward Kaminski (Bates 00793 through 00794).

41. Correspondence from Ed Kaminski to William R. Dolan, dated July 17, 2002 (Bates 00788 through 00789).

42. Correspondence from Ron Schumitz to Ed Kaminski, dated October 28, 2002 (Bates 00766).

43. Correspondence from Zbig Chrzescijanek to Ed Kaminski, dated October 30, 2002 (Bates 00858 through 00884).

44. Correspondence dated November 14, 2002 from Ron Schumitz to William Dolan (Bates 00819 through 00823, along with associated e-mail).

45. Correspondence from Zbig Chrzescijanek to Ed Kaminski, dated November 1, 2002 (Bates 00885 through 00886).

46. Correspondence from Ron Schumitz to Ed Kaminski, dated December 6, 2002 (Bates 00837).

47. Correspondence from Ron Schumitz, dated December 11, 2002 (Bates 00838 through 00842).

48.   Correspondence from Zbig Chrzescijanek to Ed Kaminski, dated December 13, 2002 (Bates 00915 through 00917).

49.   Correspondence from Zbig Chrzescijanek to Ed Kaminski, dated December 16, 2002 (Bates 00918 through 00923).

50.   Correspondence to Ed Kaminski from Theresa E. Baus, dated November 12, 2002 (Bates 00781 though 00782).

51.   Exhibits from Lumelite depositions as necessary for impeachment or explanation (Exhibits L1 thorough L45).

52.   Documents produced by Bonne Bell in response to plaintiff's subpoena as necessary for explanation, impeachment or rebuttal (BB 00001 through 00101).

53.   Correspondence dated July 10, 2001 from Terry Melick to Bob Smaldino (BB 00062).

54.   Correspondence from Ken Primer to Amy Duncan, dated May 20, 2001 (BB 00064).

55.   Correspondence from Sara Higgins to Mark Rosso, dated September 12, 2001 regarding problem with depressed balls.

56.   Documents produced by Kaufman Container in response to plaintiff's subpoena as necessary for explanation, impeachment or rebuttal.

57.   Note dated June 6, 2001 (KC 089).

58.   Correspondence from Ken Primer to Terry Melick, dated July 19, 2001 (KC 116).

59.   Exhibits from deposition of James Storar as necessary for explanation, impeachment or rebuttal.

60.   Service report, dated October 29, 2001 (including within Exhibit 2, James Storar deposition).

61.   Exhibits from deposition of Luc Duchesne as necessary for explanation, impeachment or rebuttal.

62.   Correspondence dated August 8, 2001 from Randy Wheaton to Dave Jones (Bates 00085).

63.   Correspondence dated June 1, 2000 from Randy Wheaton to Gilles Gagnier (Bates 00053 through 00054).

64.   Drawing of roller ball fitment with Wheaton's notes (Bates 00057).

65.   Correspondence from Randy Wheaton to Luc Duchesne, dated April 3, 2001, together with three pages of attachments.

66.   Exhibits from deposition of Barry Dyball as necessary for explanation, impeachment or rebuttal.

67.   Correspondence between Barry Dyball and Randy Wheaton in December 2001 (Bates 00143).

68.   Correspondence dated March 6, 2002 from Randy Wheaton to Mark Chartrand (Bates 00028).

69.   Correspondence from Barry Dyball to Randy Wheaton, dated March 13, 2002 (Bates 00092 through 00093).

70.   Correspondence from David Jones to Randy Wheaton, dated March 13, 2002 (Bates 00145).

71.   Correspondence dated March 18, 2001 from David Jones to Barry Dyball (Bates 00053).

72.   Correspondence dated March 25, 2002 from Randy Wheaton to David Jones (Bates 00025 through 00026).

73.   Additional Specification Instructions, dated April 3, 2002 (Bates 00051).

74.   Correspondence dated February 9, 2000 to Randy Wheaton from Barry Dyball (Bates 00639 through 00651).

75.   Correspondence dated January 16, 2001 from Randy Wheaton to Mark Chartrand (Bates 00273 through 00275).

76.   Correspondence to Randy Wheaton from Dennis Schinck (Bates 00045).

77.   Correspondence dated July 3, 2000 from Yves Beaumier to Randy Wheaton (Bates 00034 through 00035).

78.   Exhibits from the deposition of Guy Mercier as necessary for explanation, impeachment or rebuttal.

79.   Exhibits from the deposition of Daniel Labonte as necessary for explanation, impeachment or rebuttal.

80.   Correspondence dated July 19, 2001 from Ken Primer to Terry Melick (KC 116).

81.   Correspondence dated September 12, 2001 to Mark Rosso from Sara Higgins.

82.   Handwritten note by Theresa Melick, dated July 9, 2001 (KC 099).

83.   Handwritten notes of Theresa Melick (Defendant's Exhibit 8, Melick deposition).

84.   Exhibit 6 from Melick Deposition (larger balls dated July 18, 2001).

85.   Defendant's Exhibit 7, Melick deposition (fitment with handwriting on it).

86.   Exhibits from Patricia Hill deposition as necessary for explanation, impeachment or rebuttal.

87.   Correspondence dated March 20, 2002 from Ed Kaminski to Judith A. Hayes (Trav 0689 through 0208).

88.   Correspondence dated March 25, 2002 from Ronald Schumitz to Patricia Hill (Trav 0691).

89.   Correspondence dated March 22, 2002 from Ed Kaminski to Ron Schumitz (Trav 0613 through 0616).

90.   Correspondence dated April 8, 2002 from James B. Cahill, Jr. to Ed Kaminski (Trav 0617 through 0620)

91.   Travelers Experience Rating (Trav 0586 through 0598).

92.   Correspondence from Patricia Hill to Margaret Coenen, dated April 5, 2002 (Trav 0528).

93.   Correspondence dated April 23, 2002 from Patricia Hill to Jonathan Brynga (Trav 0520).

94.   Notice of Non-Renewal (Trav 0671 through 0675).

95.   Correspondence to Elaine Slocum, dated May 25, 2002 from Patricia Hill (Trav 0523).

96.   Underwriting Marketing Assessment (Trav 0601 through 0599).

97.   Correspondence dated July 18, 2002 from William G. Looney to Blum Shapiro (Trav 0680 through 0681).

98.   Correspondence to Craig M. Ferguson, dated July 25, 2002 from Patricia Hill (Trav 0527).

99.   Loss Ratio (Defendant's Exhibit 16, Patricia Hill deposition).

100.  Loss Ratio (Defendant's Exhibit 17, Patricia Hill deposition).

101.  Detail Loss Run (Defendant's Exhibit 18, Patricia Hill deposition).

102.  Detail Loss Run (Defendant's Exhibit 19, Patricia Hill deposition).

103.  Loss Run (Defendant's Exhibit 20, Patricia Hill deposition).

104.  Loss Run (Defendant's Exhibit 21, Patricia Hill deposition).

105.  Detail Loss Report (Defendant's Exhibit 22, Patricia Hill deposition).

106.  Claims Status (Defendant's Exhibit 23, Patricia Hill deposition).

107.  Claims Summary (Defendant's Exhibit 24, Patricia Hill deposition).

108.  Underwriting Marketing Assessment (Trav 0567 through 0569).

109.  Patricia Hill Notes (Trav 0722 through 0760).

110.  Policy Loss Listing (Defendant's Exhibit 27, Patricia Hill deposition).

111.  Detail Loss Run (Plaintiff's Exhibit B, Hill deposition).

112.  Exhibits from deposition of Ronald L. Schumitz as necessary as explanation, impeachment or rebuttal.

113.  Correspondence dated April 12, 2002 from Ed Kaminski to Elaine Slocum (Bates 00694 through 00696).

114.  Correspondence from Ed Kaminski to Ron Schumitz, dated May 16, 2002 (Bates 00710 through 00713).

115.  List of Markets (Bates 00718 through 00719).

116.  Correspondence dated June 28, 2002 from Elaine Slocum to Ed Kaminski (Bates 00748).

117.   Correspondence dated July 8, 2002 from Elaine Slocum to Ed Kaminski (Bates 00798 through 00797).

118.   Correspondence dated October 28, 2002 from Ron Schumitz to Ed Kaminski (Bates 00766).

119.   Correspondence dated December 6, 2002 from Ron Schumitz to Ed Kaminski (Bates 00837).

120.   Correspondence dated December 1, 2002 from Ron Schumitz to Ed Kaminski (Bates 00838 through 00842).

121.   Summary of Status, dated December 12, 2002 (Defendant's Exhibit 31, Ronald Schumitz deposition).

122.   Correspondence dated November 18, 2003 to Ron Turner from Elaine Slocum (Defendant's Exhibit 32, Ronald Schumitz deposition).

123.   Correspondence dated March 18, 2002 from Ed Kaminski to Ron Schumitz (Defendant's Exhibit 33, Ronald Schumitz deposition).

124.   Exhibits attached to report of Joseph McFadden, dated July 15, 2004.

125.   Exhibits from deposition of Michael Ceci as necessary for explanation, impeachment or rebuttal.

126.   Inventory History Search (Defendant's Exhibit 2, Michael Ceci deposition).

127.   Inventory History Search (Defendant's Exhibit 3, Michael Ceci deposition).

128.   Defendant's Exhibit 4, Michael Ceci deposition.

129.   Defendant's Exhibit 5, Michael Ceci deposition.

130. Defendant's Exhibit 6, Michael Ceci deposition.

131. Defendant's Exhibit 7, Michael Ceci deposition.

132. Defendant's Exhibit 8, Michael Ceci deposition.

133. Daily Production Schedule (Defendant's Exhibit 9, Michael Ceci deposition).

134. Daily Production Schedule (Defendant's Exhibit 10, Michael Ceci deposition).

135. Daily Production Schedule (Defendant's Exhibit 11, Michael Ceci deposition).

136. Daily Production Schedule (Defendant's Exhibit 12, Michael Ceci deposition).

137. Daily Production Schedule (Defendant's Exhibit 13, Michael Ceci deposition).

138. Daily Production Schedule (Defendant's Exhibit 14, Michael Ceci deposition).

139. Daily Production Schedule (Defendant's Exhibit 15, Michael Ceci deposition).

140. Daily Production Schedule (Defendant's Exhibit 16, Michael Ceci deposition).

141. Daily Production Schedule (Defendant's Exhibit 18, Michael Ceci deposition).

142. Daily Production Schedule (Defendant's Exhibit 19, Michael Ceci deposition).

143. Daily Production Schedule (Defendant's Exhibit 20, Michael Ceci deposition).

144. Record of Glitter Roll-On Sales 2000-2002 (Defendant's Exhibit 21, Michael Ceci deposition).

145. Glitter Roll-On Returns 2000-2002 (Defendant's Exhibit 22, Michael Ceci deposition).

146.   QA Incoming History Record (Bates 00479).

147.   Correspondence from John J. Nilla to Watson Warriner, dated May 6, 2002 (Defendant's Exhibit 28, Michael Ceci deposition).

148.   Correspondence from Jack Nilla to Caroline Milts, dated June 16, 2000, with attached Covipak invoice (Defendant's Exhibit 29, Michael Ceci deposition).

149.   Exhibits from deposition of Therese Marie Butler-Melick as necessary for explanation, impeachment or rebuttal.

150.   Exhibits from deposition of Kenneth Primer as necessary for explanation, impeachment or rebuttal.

151.   Exhibits from deposition of Raymond Severa as necessary for explanation, impeachment or rebuttal.

152.   Exhibits from deposition of Edward Kaminski as necessary for explanation, impeachment or rebuttal.

153.   Exhibits from deposition of Randy Wheaton as necessary for explanation, impeachment or rebuttal.

154.   Exhibits from deposition of Mark Laracy as necessary for explanation, impeachment or rebuttal.

155.   Lawsuits and claims made against plaintiff by injured consumers.

(12)   **DEPOSITION TESTIMONY:**

**Plaintiff**

Unknown.

−31−

**Defendant**

Defendant does not know what testimony plaintiff intends to introduce by way of

deposition transcript. Thus, defendant is not in a position to designate other portions of said

transcripts which may be required for explanation, impeachment or rebuttal. Defendant reserves

the right to amend and/or supplement this response until after receipt of plaintiff's portion of the

Joint Trial Memorandum.

Defendant may offer the following portions of depositions as evidence:

1.    **Luc Duchesne, January 15, 2004**, pp. 6/8 through 6/17; pp. 14/1 through 21/7; pp. 30/17
      through 31/9; pp. 36/20 through 36/22; pp. 38/2 through 38/6; pp. 39/19 through 39/22; pp.
      42/25 through 43/11; pp. 48/17 through 48/19; pp. 51/1 through 51/3; pp. 51/17 through
      51/21; pp. 52/9 through 52/12; pp. 52/17 through 52/19; pp. 60/6 through 60/11; pp. 62/23
      through 63/9; pp. 71/7 through 72/5; pp. 73/19 through 73/23; pp. 74/5 through 74/21; pp.
      75/1 through 75/4; pp. 76/14 through 76/17; pp. 79/17 through 79/24; pp. 81/8 through
      84/5; pp. 88/15 through 88/25; pp. 89/1 through 89/25; pp. 90/20 through 91/7; pp. 92/8
      through 92/12; pp. 92/21 through 93/18; pp. 96/6 through 96/9; pp. 100/14 through 101/10;
      pp. 109/5 through 109/23; pp. 109/24; pp. 111/17; pp. 113/12 through 113/25; pp. 114/1
      through 115/23; pp. 115/24 through 116/10; pp. 116/17 through 117/8; pp. 119/7 through
      119/25; pp. 131/23 through 132/3; pp. 138/18 through 139/5; pp. 147/23 through 148/24;
      pp. 148/25 through 154/22; pp. 155/6 through 155/15; pp. 156/12 through 157/14.

2.    **Barry Dyball, August 5, 2003**, pp. 12/13; pp. 14/19 through 7/16; pp. 18/1 through 18/16;
      pp. 23/6 through 37/3; pp. 38/13 through 48/20; pp. 59/3 through 65/4; pp. 68/21 through
      71/14; pp. 72/9 through 73/3; pp. 73/10 through 179; pp. 173/13 through 194/14.

3.    **Barry Dyball, August 6, 2003**, pp. 57 through 159.

4.  **M. Guy Mercier, August 12, 2004**, pp. 35/8 through 36/23; pp. 38/12 through 22; pp. 52/10 through 53/25; pp. 55/20 through 56/4; pp. 61/13 through 62/1; pp. 66/4 through 66/13; pp. 79/23 through 80/14; pp. 97/6 through 97/11; pp. 102/20 through 105; pp. 106/23 through 107/13; pp. 112/22 through 115/7;  pp. 167/24 through 172/8; pp. 175/22 through 176/12; pp. 177/3 through 178/2; pp. 180/15; pp. 192/3 through 192/13; pp. 192/19 through 193/6; pp. 193/12 through 194/2; pp. 197/6 through 200/4.

5.  **Daniel Labonte, August 23, 2004**, pp. 30/2 through 31/16; pp. 36/14 through 37/14; pp. 38/15 through 39/8; pp 39/9 through 40/12; pp. 41/2 through 41/21; pp. 48/24 through 49/17; pp. 50/12 through 51/18; pp. 54/20 through 57/2; pp. 63/5 through 64/7; pp. 64/19 through 65/1; pp. 66/10 through 68/13; 68/14 through 70/4; pp. 83/1 through 84/4 through 86/13; pp. 90/18 through 91/25; pp. 127/15 through 128/7;  pp.164/13 through 165/12;  pp. 184/22 through 185/4; pp. 187/11 through 187/17; pp. 284/8 through 287/1; pp. 292/25 through 293/15; pp. 297/12 through 298/19; pp. 298/6 through 298/19; pp. 298/22 through 299/7; pp. 299/5; pp. 299/16 through 300/5; pp. 300/8 through 300/15.

6.  **Therese Marie Butler-Melick, November 20, 2003**, pp. 239/10 through 241/3; pp. 241/12 through 241/18; pp. 243/7 through 246/3; pp. 252/2 through 258/1; pp. 258/2 through 260/11; pp. 264/17 through 276/24; pp. 268/3 through 270/4; pp. 270/20 through 276/11; pp. 276/13 through 277/5; pp. 277/10 through 278/15; pp. 279/3 through 279/19; pp. 279/20 through 284/15; pp. 284/20 through 288/3; pp. 296/17 through 299/13; pp. 320/13 through 321/9; pp. 322/1 through 323/5; pp. 325/20 through 326/10.

7.  **Kenneth Primer, November 20, 2003**, pp. 89/24 through 90/6; pp. 90/18 through 91/2; pp. 91/9 through 91/12; pp. 91/23 through 92/20; pp. 100/7 through 100/15; pp. 101/6 through 101/19.

8.  **Raymond Severa, August 14, 2003**, pp. 26 through 29/10; pp. 33/6 through 21; 36/20 through 37/1; pp. 55/12 through 55/21; pp. 73/11 through 73/24; pp. 74/13 through 75/4; pp. 77/22 through 78/21; pp. 79/19 through 80/2; pp. 106/21 through 107/19; pp. 108/6 through 108/7; pp. 108/22 through 108/11; pp. 112 through 123/20; pp. 125/19 through 126/10; pp. 128/4 through 129/22; pp. 138/1 through 139/9; pp. 141/6 through 146/15; pp. 143/4 through 143/10; pp. 150/1 through 150/18; pp. 158/7 through 158/22.

126/10; pp. 128/4 through 129/22; pp. 138/1 through 139/9; pp. 141/6 through 146/15; pp. 143/4 through 143/10; pp. 150/1 through 150/18; pp. 158/7 through 158/22.

9. **James Storar, March 10, 2004**, pp. 60/24 through 62/7; pp. 62/23 through 63/7; pp. 63/24 through 64/3; pp. 65/6 through 65/8; pp. 73/19 through 73/23; pp. 86/23 through 87/12; 91/24 through 92/12; pp. 95/2 through 95/9; pp. 101/21 through 102/6; pp. 114/3 through 114/7; pp. 114/17 through 114/21; pp. 117/15 through 117/23; pp. 119/7 through 119/12; pp. 122/12 through 122/18; pp. 137/15 through 137/17; pp. 142/7 through 166/10; 168/13 through 168/22; pp. 180/5 through 180/23; pp. 182/24 through 183/4.

(13)   **REQUESTS FOR JURY INSTRUCTIONS**: Not applicable.

(14)   **ANTICIPATED EVIDENTIARY PROBLEMS:** Without knowing what evidence

plaintiff intends to introduce at trial, it is difficult for defendant to identify anticipated evidentiary

problems. However, defendant reserves the right to amend this portion of the Joint Trial

Memorandum after it receives plaintiff's portion.

(15)   **PROPOSED FINDINGS AND CONCLUSIONS:**

   A.   **Findings of Fact**

1.     Plaintiff designed and manufactured a butterfly shaped flexible plastic bottle. It then

purchased an alcohol-based perfume infused with metallic glitter to go inside the bottle, purchased

from defendant an off-the-shelf roller ball fitment (the "fitment") to go on top of the bottle, and

purchased from another supplier a cap to go on top of that.

2.     In defiance of established industry practice, plaintiff did not bother to thoroughly test the

packaging it designed or to adequately test whether the various components worked together.

Although the alcohol-based metallic-glitter-infused perfume was classified by the United States

Government as an eye irritant and plaintiff intended to market its product to young girls, it did not

affix a warning label to its product and never bothered to establish a recall procedure.

3.     Plaintiff did not ask for defendant's advice or opinion when it designed its package, did

not advise defendant that it intended to use the fitments with a flexible bottle and did not inquire

as to the amount of pressure the $.017 fitments were designed to withstand.

4.     The ordinary purpose of the fitments is to dispense a gravity fed product through rolling

action. The fitments are designed to be used on a stiff bottle to dispense deodorant, lip gloss or

make-up where it is desired that a thin film of the product be applied to a consumer's skin.

5.     With the single exception of plaintiff's radical and irresponsible usage, the fitments are

never used with a bottle in which internal pressure might build up without a means of release.

6.     Not only is the fitment not designed to withstand excess pressure, but also pressure

impedes its function by interfering with the rolling of the roller ball. The bottle designed by

plaintiff built up pressure when squeezed, or heated, and, by reason of its design, invited its young

customers to squeeze it.

7.     Plaintiff did not a) test its package for roller ball retention under pressure, b) advise

defendant that it intended to use the fitments with a flexible bottle, c) provide defendant with any specifications for ball retention, d) ask for defendant's advice or opinion when it designed its package, e) advise defendant that it intended to use the fitments with a flexible bottle or f) inquire as to the amount of pressure the $.017 fitments were designed to withstand.

8     Defendant had no way to anticipate that plaintiff intended to radically misuse its product, or that it would, in defiance of established industry practice and common sense, put its product on the market without adequate testing or required warning labels.

9.     Prior to any transaction between plaintiff and defendant, plaintiff purchased approximately a million fitments from a Canadian company known as Covipak, and plaintiff used them on its original package without problem or complaint.

10.    Plaintiff did not supply Covipak with any specifications for the fitments, instead it examined and then approved samples Covipak produced.

11.    After Covipak went bankrupt and defendant purchased the mold that Covipack had used to make the fitments, plaintiff approached defendant to order the same type of fitments it had previously purchased from Covipak.

12.    On or around February 16, 2001, plaintiff and defendant reached an oral agreement as to all material terms of the transaction.

13.    On February 21, Plaintiff confirmed this agreement by faxing a purchase order dated

February 16 which contained all of the material terms of the parties' agreement (the "Purchase

Order").

14.    The Purchase Order, which was signed by plaintiff, indicated that it was binding on

plaintiff without the need for an additional copy to be mailed, and it contained no reference to

there being additional terms to the parties' contract other than those that appeared on the face of

the Purchase Order.  It also stated that there were no specifications for the fitments ordered.

15.    On February 22, defendant, consistent with industry practice, issued its internal purchase

order and began working on filling the order.

16.    After February 22, defendant received from plaintiff a mailed copy of the Purchase Order,

but this copy, unlike the faxed copy which confirmed the parties' agreement, had additional terms

on its reverse side which were never discussed or agreed to by the parties.  Defendant never read

the reverse side of the mailed copy because it believed that the faxed copy constituted the parties'

contract.

17.    Defendant began performing on the contract prior to its receipt of the mailing.

18.    Between February and July of 2001, plaintiff received at least four complaints that its

young customers had sustained serious eye injuries when pressure built up inside its bottle and

caused the roller ball and toxic fill to be expelled.

19.    After receiving such complaints, plaintiff asked Knowlton to perform additional tests. Those tests revealed that when the bottle was squeezed the roller ball and the toxic contents would fly out, sometimes with considerable force. As part of its testing, Knowlton measured the pressure at which roller balls would be expelled from the fitments and measured the area of the fitment responsible for ball retention. The consistency of the fitments' retention diameters and the extent to which the fitments retained roller balls under pressure was clearly acceptable to plaintiff as plaintiff continued to market, manufacture and sell its product after receiving the results of Knowlton's tests. Indeed plaintiff, after receiving and testing the fitments, never, in the course of the parties' business relationship, rejected a single one of them.

20.    Each of the four senior officers of plaintiff squeezed the bottle and expelled the roller ball and fill. Yet plaintiff blithely continued to manufacture, market and ship its product and did not even bother to affix warning labels to it.

21.    On August 2, 2001, Randy Wheaton, plaintiff's vice president, sent a letter to Mark Rosso of Le Papillon suggesting "We need to come up with a game plan on how to modify this roller ball system to lock the ball in place for future runs." Although plaintiff knew that its customers were being injured, plaintiff expressed no urgency and did not ask for defendant's assistance in

−38−

solving the present problem, its only expressed concern was for "future runs." Plaintiff did not tell defendant of its customers' injuries until January of the following year, and did not make any further inquiries of defendant between August and January.

22.     In March of 2002, defendant, concerned that plaintiff intended to continue to sell its dangerous product, sold the mold that produced the fitments to plaintiff for $1.

23.     Plaintiff is still using the mold it purchased from defendant to produce fitments, and because it has ceased using a flexible bottle has ceased to have problems.

24.     There is no evidence that any of the consumer injuries resulted from defective or inconsistent fitments.

25.     In late June or early July of 2001 defendant received a complaint from Bonne Bell that roller balls were being sucked out of fitments by a vacuum assist that Bonne Bell was using on its assembly line. Bonne Bell never determined the amount of vacuum pressure that its production line applied to the fitments to suck out the ball. Ultimately, Bonne Bell's problem was solved by using a larger ball, but, as plaintiff's tests showed, that fix would not have ameliorated the problem plaintiff was experiencing due to pressure build up in its improvidently designed bottles.

26.     The Bonne Bell situation was unrelated to the problem that was causing injuries to plaintiff's customers.

27.    If defendant had told plaintiff about the Bonne Bell situation, plaintiff would not have

learned any material facts which it did not already know.  Plaintiff had known of eye injuries

sustained by its customers as early as February of 2001 and that roller balls and toxic fill would be

expelled if the bottle was squeezed and it had even done tests that established the amount of

pressure needed to expel the roller balls.   Moreover, the solution of the Bonne Bell problem was

tried by plaintiff and did not work for it.

28.    Plaintiff's increased insurance costs since 2002 were due to a hardening in the insurance

market subsequent to 9/11 and plaintiff's own irresponsible conduct.

29.    Plaintiff saved more money by not purchasing products liability insurance than it spent in

connection with uninsured products liability claims.

### B.    Conclusions of Law

1.    The printed terms on the reverse side of the Purchase Order which plaintiff mailed to

defendant do not constitute part of the contract between the parties.

2.    Defendant cannot be held to the express warranties contained in the printed terms on the

reverse side of the Purchase Order which plaintiff mailed to defendant.

3.    The fitments were merchantable as they were fit for the ordinary purpose for which they

are used.

–40–

4.    Defendant did not breach its warranty that the fitments were suitable for plaintiff's

intended uses and purposes as plaintiff, unbeknownst to defendant, made a radical misuse of the

product.

5.    Defendant did not breach its implied warranty of fitness for a particular purpose as

plaintiff did not disclose its intended use of the fitment and plaintiff's intended use was unusual

and dangerous.

6.    Plaintiff's damages are due to its own culpable conduct including failing to properly test

the product it designed, failing to affix warning labels to its product and failing to cease

manufacturing, marketing and selling its product when it learned that it was causing serious

injuries to its customers.

7.    Defendant is not liable for plaintiff's attorneys' fees or punitive damages under CUTPA as

defendant did not engage in any unfair or deceptive acts or practices.

8.    Plaintiff's CUTPA claim is barred by the statute of limitations.

9.    Defendant is not liable for plaintiff's increased insurance costs as any connection between

such increases and anything defendant did or failed to do is unduly speculative.

10    Defendant is not liable for future increases in plaintiff's insurance costs as any connection

between such increases and anything defendant did or failed to do is unduly speculative.

11.     Defendant is not liable for plaintiff's increased insurance costs or future increases in plaintiff's insurance costs as such damages were not sufficiently foreseeable.

12.     Defendant is not liable for costs plaintiff incurred because it unilaterally decided to rework its product or tooling as such damages were not foreseeable and were incurred by reason of plaintiff's unilateral decision.

13.     Defendant is not liable for costs relating to plaintiff's disposition of unwanted inventory because such costs were incurred by virtue of plaintiff having designed a dangerous and unworkable product.

14.     Plaintiff's legal fees were unreasonable given the small amount of legally cognizable damages it sustained.

15.     Defendant is entitled to indemnification for all fees and judgments arising out of claims asserted by customers of plaintiff as the customers' injuries resulted not from anything defendant did or failed to do but rather from plaintiff's failure to properly design and test its product and failure to take remedial action when it learned that its product was causing serious injury.

(16)     **TRIAL TIME:** The plaintiff estimates that it will require _____ days to present its case. The defendant estimates that it will require 5 days to present its case.

(17)    **FURTHER PROCEEDINGS:** The defendant anticipates filing an Objection to

Magistrate Judge Martinez' Ruling , dated October 12, 2004.

(18)    **ELECTION FOR TRIAL BY MAGISTRATE:**   The defendant does not consent to a

trial by a United States Magistrate Judge.

(19)    **VERDICT FORMS:**   Not applicable.

FOR THE PLAINTIFF,
PARFUMS DE COEUR, LTD.

By:_____
    Richard E. Castiglioni, Esq. (ct072820)
    Diserio, Martin, O'Connor & Castiglioni
    One Atlantic Street
    Stamford, CT 06901
    Phone No. 203-358-0800

Date:_____

FOR THE DEFENDANT,
LE PAPILLON, LTD.

By:_____
    Michael T. Ryan, Esq., (CT 05685)
    Ryan, Ryan, Johnson & Deluca, LLP
    80 Fourth Street, P.O. Box 3057
    Stamford, CT   06905
    Phone No. 203-357-9200

Date:  October 22, 2004_____

FOR THE DEFENDANT,
LE PAPILLON, LTD.

By: _____
    Robert N. Chan, Esq. (ct25602)
    Robson, Ferber, Frost, Chan & Essner, LLP
    530 Fifth Avenue
    New York, NY 10036-5101
    Phone No. 212-944-2200

Date:_____

FOR THE DEFENDANT ON THE
COUNTERCLAIM, PARFUMS DE COEUR

By:_____
    Peter D. Clark, Esq. (ct06814)
    Law Offices of Peter D. Clark
    525 Bridgeport Avenue
    Bridgeport, CT 06484
    Phone No. 203-925-9688

Date:_____

I:\Procases\720 123\jointrialmemo.wpd
720 123

–44–