UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| PARFUMS DE COEUR, LTD. | : | CIVIL ACTION NO. |
| | : | 302 CV 1454 (RNC) |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| LE PAPILLON, LTD. | : | |
| | : | |
| Defendant, | : | OCTOBER 26, 2004 |

**JOINT TRIAL MEMORANDUM**

Pursuant to this Court's order of June 7, 2004, Plaintiff, PARFUMS DE COEUR, LTD.,

("Plaintiff" or "PARFUMS") submits its portion of the joint trial memorandum. Plaintiff and

Defendant have agreed to meet to promptly file a Joint Revised Trial Memorandum this week with

the Court's permission.

**1.    TRIAL COUNSEL**

Plaintiff's Trial Counsel:

Richard E. Castiglioni
Jonathan M. Shapiro
Diserio Martin O'Connor & Castiglioni, LLP
One Atlantic Street
Stamford, Connecticut 06901

And

Peter D. Clark (on the Counter-claim)
Clark & Deakin
525 Bridgeport Avenue
Shelton, Connecticut 06484

1

For the Defendant:
Michael T. Ryan
Ryan, Ryan, Johnson & Deluca, LLP
80 Fourth Street, P.O. Box 3057
Stamford, CT 06905-3057

And

Robert N. Chan
Robson Ferber Frost Chan & Essner, LLP
530 Fifth Avenue
New York, NY 10036

**2.      JURISDICTION**

The United States District Court for the District of Connecticut has jurisdiction over this

civil action pursuant to 28 U.S.C. § 1332 in that the sum in controversy exceeds the sum or value

of $75,000, exclusive of interest and costs and is between citizens of different states.


**3.      JURY/NON-JURY**

This case is to be tried to the court.

**4.      NATURE OF THE CASE**

**A.      Plaintiff's Complaint**

**First Count:  Breach of Contract**

In the First Count, Plaintiff seeks to recover damages resulting from Defendant's breach of a

contract between the parties pursuant to which Defendant agreed to sell Plaintiff certain roller-ball

and fitment assemblies for use with Plaintiff's Glitter Roll-On bottles.  Pursuant to the purchase

orders, Defendant expressly stated that the fitments were "of merchantable quality, conforms to

specifications and is suitable for the Purchaser's intended uses and purposes in the ordinary course

of business."  Defendant failed to provide such a product due to a defect which caused the roller balls to pop out of the fitments.  Plaintiff seeks the recovery of money damages and equitable relief as this Court deems just and proper resulting from said breach.

**Second Count: (Breach of Express Warranty)**

In the Second Count, Plaintiff seeks to recover damages resulting from Defendant's breach of the express warranties contained in the contract between the parties pursuant to which Defendant agreed to sell Plaintiff certain roller-ball and fitment assemblies for use with Plaintiff's Glitter Roll-On bottles.  Pursuant to the purchase orders, Defendant expressly stated that the fitments were "of merchantable quality, conforms to specifications and is suitable for the Purchaser's intended uses and purposes in the ordinary course of business."  Defendant failed to provide such a product due to a defect which caused the roller balls to pop out of the fitments.  Plaintiff seeks the recovery of money damages and equitable relief as this Court deems just and proper resulting from said breach.

**Third Count: (Breach of Implied Warranty of Merchantability)**

Plaintiff seeks damages under the Uniform Commercial Code resulting from Defendant's failure to provide a product suitable in the trade due to a defect which caused the roller balls to pop out of the fitments.

**Fourth Count:  (Breach of Implied Warranty of Fitness)**

Plaintiff seeks money damages and equitable relief under the Uniform Commercial Code resulting from Defendant's failure to provide a product that was fit for its particular purpose due to a defect which caused the roller balls to pop out of the fitments.

**Fifth Count: (Contractual Indemnification)**

Plaintiff seeks to be indemnified by Defendant pursuant to its written contract in connection with various claims and lawsuits Plaintiff has been subjected to as a result of the defective products provided by Defendant.

**Sixth Count: (Contribution)**

Plaintiff was denied leave by the Court to add this count to its action.

**Seventh Count: (Connecticut Unfair Trade Practices Act)**

Plaintiff seeks to recover against Defendant for its unfair and deceptive trade practices directed toward Plaintiff, acts in violation of Conn. Gen. Stat. § 42-110a et seq., the Connecticut Unfair Trade Practices Act ("CUTPA") in which Defendant failed to disclose its knowledge about the defective nature of its fitments.   Plaintiff seeks money damages, punitive and exemplary damages, attorney's fees and equitable relief based on Defendant's CUTPA violations.

**B.    Defendant's Answer**

Defendant has denied the material allegations of Plaintiff's complaint, and has asserted the following affirmative defenses:

**First Affirmative Defense**

Failure to state a claim upon which relief may be granted.

**Second Affirmative Defense**

Plaintiff's claims are barred by the doctrine of waiver and estoppel.

**Third Affirmative Defense**

Plaintiff never informed Defendant, prior to Defendant's delivery of roller ball assemblies to

plaintiff that plaintiff intended to use these assemblies in a flexible container.

**Fourth Affirmative Defense**

Plaintiff, prior to ordering assemblies from Defendant, failed to investigate whether these assemblies could function properly on a flexible container.

**Fifth Affirmative Defense**

Plaintiff failed to mitigate damages.

**Sixth Affirmative Defense**

The CUTPA claim is barred by the statute of limitations.

Defendant has also filed a counter-claim against Plaintiff seeking indemnification for any fees, judgments or other consequential damages resulting from claims asserted against Defendant by customers of Plaintiff who were injured by Plaintiff's product.

**5.    STIPULATIONS OF FACT AND LAW**

The parties have not yet stipulated to any facts or law.  However, they are meeting to prepare appropriate stipulations.

**6.    PLAINTIFF'S CONTENTIONS**

Plaintiff is a mass marketer of perfume fragrances.  Plaintiff's products have included a line of fragrances that were packaged in various Glitter Roll-On containers.  Customers apply the product from these containers through the use of a roller ball fitment applicator.  At all relevant times, the roller ball fitment was purchased from Defendant.

Proof of Plaintiff's breach of contract, breach of warranty, and CUTPA claims all relate to the failure of the fitments to retain the roller ball and Defendant's knowledge and concealment of the

situation.  With respect to Plaintiff's claims for breach of contract and breach of express warranty, both derive from the various purchase orders entered into between Plaintiff and Defendant.  In relevant part, the purchase orders provide, "In accepting this purchase order, the Seller unconditionally represents and warrants any other representation or agreement to the contrary notwithstanding, that the material supplied pursuant to this purchase order is of merchantable quality, conforms to specifications and is suitable for the Purchaser's intended uses and purposes in the ordinary course of his business."  Plaintiff contends that the parties entered the purchase orders on or about February 16, 2001 and that the entry of these purchase orders establishes the formation of a contract and the existence of the express warranties.

In addition, Plaintiff's Complaint alleges that Defendant breached the implied warranty of merchantability and implied warranty of fitness for a particular purpose under the Uniform Commercial Code.  Plaintiff contends that the fitments were not fit for normal use, were not acceptable in the trade, were not suitable for PARFUMS' intended uses and purposes in the ordinary course of business and that they did not conform to specifications.

As stated, users of Plaintiff's product apply it through the use of the roller ball fitment.  The normal, acceptable use of the fitment in the trade is to dispense product through the fitment as a result of the rolling action of the ball retained within the fitment.  Defendant was aware of Plaintiff's ordinary business, and of how Plaintiff intended to use the fitment.  Plaintiff contends that Defendant breached its express and implied warranties as a result of the failure of the fitments to properly retain the roller ball.  As discussed further below, the fact that another customer of Defendant's also rejected the fitments due to problems it experienced with the fitments, including the fitments failure

6

to retain the roller ball, further supports the Plaintiff's contentions.

With respect to the specifications of the fitment, Plaintiff contends that a drawing labeled "Covipak" and dated July 7, 2000 provided the specifications to which the fitments had to conform. Defendant was aware of Plaintiff's specifications, acknowledged the existence of specifications in their counter-claim, and acknowledged that the Covipak drawing represented Plaintiff's specifications. Moreover, PAPILLON had represented to Kaufman that the drawing was the specification for the parts. Kaufman and its customer repeatedly rejected these fitments for failing to meet specifications. Testing conducted by representatives of PARFUMS after discovering the problem with the fitments confirmed the inconsistency of the fitments molded by PAPILLON and their failure to meet specifications. Measurements taken by PARFUMS' filler, Knowlton, demonstrated that the neck dimensions of the fitments ranged from .390" to .393" which fail to meet Plaintiff's specifications. Defendant also breached its express warranties by failing to meet these specifications.

Plaintiff's CUTPA claim is likewise based, in part, on the failure of the fitments to retain the roller ball. Plaintiff contends that Defendant failed to disclose its knowledge about the defective nature of its fitments to Plaintiff. During the June/July 2001 time period, PAPILLON had received notification from another of its customers, Kaufman Container, that its fitments were failing. Specifically, Kaufman's customer, Bonne Bell, discovered that the fitments failed to retain the roller ball. Balls were found loose or disengaged from the fitments in the bins and a vacuum assist that Bonne Bell used in its assembly line for its product would attach to the roller ball in order to move the entire fitment. However, due to the defective fitment, the vacuum assist, under very low

7

pressure, would suck the ball from the fitment.  Bonne Bell had not experienced failure with its previous fitment nor did it have a pressure test in place at that time to check for retention values.  It developed a test and found the PAPILLON parts to be inconsistent and failing in large numbers.

After receiving notification of the fitment's failure from Kaufman, Defendant began to investigate the problem in an attempt to correct it.[1]  At this point, however, PAPILLON did not notify PARFUMS of this issue despite PARFUMS' submission of another purchase order for additional fitments.  Soon thereafter, on August 2, 2001, PARFUMS notified PAPILLON that it too had received complaints that the fitments failed to retain the roller ball and that injury had occurred.  Plaintiff provided Defendant with samples of its packaging and pressure testing results, and requested assistance in finding the source of the problem.  Despite possessing the knowledge that both Kaufman/Bonne Bell and PARFUMS were experiencing failure with the retention of the roller ball, PAPILLON did not notify PARFUMS of Kaufman's problems or its investigation despite Plaintiff's request for assistance.

After repeated failures to correct the problems Kaufman experienced with the fitment, PAPILLON hired an outside consultant, James Storar ("Storar"), to investigate the situation in October 2001.  During the time from Plaintiff's notification to Defendant in the beginning of August 2001 through Mr. Storar's investigation, Plaintiff remained in contact with Defendant regarding changes that were being attempted.  The results of Mr. Storar's examination of the mold demonstrate that the fitments sold by PAPILLON were defective.

---

[1] Kaufman also experienced other problems with the fitment including leaking and poor rollability of the roller ball. Bonne Bell was most concerned about the issues with ball retention.

During his investigation, Mr. Storar traveled to Optiplast, Defendant's molder, in order to examine the mold. While at Optiplast, Mr. Storar measured two dimensions on the core pins used with the mold to create the fitments. Mr. Storar's examination determined that the twenty-four cavity core pins which make the fitment were very inconsistent, two mold cavities were blocked, and two of the cavities were below specification. In a report prepared by Mr. Storar after the commencement of this litigation, he further acknowledged that the core pins that make the shape for the ball were very inconsistent cavity to cavity. Two cavities were even below specification. As a result of the inconsistent core pins, it was not possible for Defendant to produce consistent parts that were all within specification and that would be fit for their ordinary purposes.

Defendant's failure to advise Plaintiff of its knowledge that another customer experienced an identical problem with the fitments as well as its decision to continue to fill orders by Plaintiff while it took efforts to solve the problem without advising Plaintiff of such efforts offends public policy, is immoral, unethical, oppressive or unscrupulous and resulted in further injury to PARFUMS' and its customers.

Finally, with respect to PARFUMS' indemnity claim, the purchase orders by which PARFUMS purchased the fitments clearly stated that Defendant would hold PARFUMS "harmless against any liability, judgment, damages, incidental or consequential, loss or expense, including reasonable counsel fees resulting from Seller's failure to meet the requirements of the [warranties]." As stated, Plaintiff contends that the parties entered the purchase orders on or about February 16, 2001 and that the entry of these purchase orders establishes the formation of a contract including this express indemnification language.

9

**7.    DEFENDANT'S CONTENTIONS**

**8.    LEGAL ISSUES**

- Whether the terms and conditions on the purchase order were part of the agreement reached by the parties.

- Whether the fitments were merchantable at the time of sale.

- Whether the fitments were fit for the ordinary purpose for which goods are used.

- Whether the fitments were fit for Plaintiff's particular purposes.

- Whether Defendant had a duty to disclose its knowledge of similar failures of the fitment experienced by another customer and Defendant's investigation into the situation.

- Whether Luc Duchesne was an agent of Defendant.

- Whether the language contained in the purchase order created a contractual obligation to indemnify.

- Whether Defendant's failure to disclose its knowledge of similar failures of its product constitutes an unfair and deceptive trade practice under the Connecticut Unfair Trade Practices Act.

**9.    VOIR DIRE QUESTIONS**

Not applicable.

**10.    LIST OF WITNESSES**

**A.    Plaintiff's Potential Witnesses**

1.      **Mark Laracy**
        **President**
        **Parfums De Coeur, Ltd.**
        **85 Old Kings Highway**
        **Darien, Connecticut 06820**

Mr. Laracy will testify as to the facts and circumstances surrounding the allegations contained in Plaintiff's Amended Complaint; his education and background; his job functions at Parfums De Coeur; and his business dealings with Le Papillon and its predecessors. Mr. Laracy will testify regarding the business of Parfums de Coeur, and as to meetings and communications that occurred with Le Papillon during the time the contract was made and subsequent to the discovery of the problems with the fitments. Mr. Laracy will testify concerning Watson Warriner's admission of liability concerning the defective fitments.

Mr. Laracy's testimony, coupled with that of Plaintiff's other witnesses will establish all the elements of a prima facie case of each of the claims that Plaintiff brings against Defendant.

2.      **Randy Wheaton**
        **Vice President of Package Development & Engineering**
        **Parfums De Coeur, Ltd.**
        **85 Old Kings Highway**
        **Darien, Connecticut 06820**

Mr. Wheaton will testify as to the facts and circumstances surrounding the allegations contained in Plaintiff's Amended Complaint; his education and background; his job functions at Parfums De Coeur; and his business dealings with Le Papillon and its predecessors. Mr. Wheaton will testify regarding Parfums de Coeur's development of its Glitter Roll-On products and his subsequent involvement after the discovery of problems with the fitment. Mr. Wheaton will testify regarding meetings and communications that occurred with Le Papillon during the time the contract

was made and subsequent to the discovery of the problems with the fitments.  He will testify

concerning efforts made to identify the fitments that had failed, why fitments were failing, and his

efforts and the efforts of others to find a solution to the problem.  Mr. Wheaton will also testify

concerning Watson Warriner's admission of liability concerning the defective fitments.

Mr. Wheaton's testimony, coupled with that of Plaintiff's other witnesses will establish all

the elements of a prima facie case of each of the claims that Plaintiff brings against Defendant.

    **3.**    **Edward Kaminski**
**Vice-President of Finance Administration**
**Chief Financial Officer**
**Parfums De Coeur, Ltd.**
**85 Old Kings Highway**
**Darien, Connecticut 06820**

Mr. Kaminski will testify as to the facts and circumstances surrounding the allegations

contained in Plaintiff's Amended Complaint; his education and background; his job functions at

Parfums De Coeur; and his business dealings with Le Papillon and its predecessors.  Mr. Kaminski

will testify regarding Parfums de Coeur's procedure for handling complaints and claims, and its

interaction with its insurer.  Mr. Kaminski will also testify regarding Parfum de Coeur's efforts to

obtain new insurance following the cancellation of its policies in the spring 2002.  Mr. Kaminski

will testify as to damages sustained by Plaintiff due to increased insurance cost, uninsured claims

and other damages as well as the legal fees and expenses sustained by Plaintiff.  Mr. Kaminski will

testify to meetings and communications that occurred with Le Papillon during the time the contract

was made and subsequent to the discovery of the problems with the fitments.  Mr. Kaminski will

also testify concerning Watson Warriner's admission of liability concerning the defective fitments

Mr. Kaminski's testimony, coupled with that of Plaintiff's other witnesses will establish all the elements of a prima facie case of each of the claims that Plaintiff brings against Defendant.

    **4.**      **John J. Nilla**
                   **Vice President of Purchasing**
                   **Parfums De Coeur, Ltd.**
                   **85 Old Kings Highway**
                   **Darien, Connecticut 06820**

Mr. Nilla will testify as to the facts and circumstances surrounding the allegations contained in Plaintiff's Amended Complaint; his education and background; his job functions at Parfums De Coeur; and his business dealings with Le Papillon and its predecessors.  Mr. Nilla will testify regarding Parfums de Coeur's procedure for entering into purchase orders and the circumstances surrounding the entry of the contract between the parties.  Mr. Nilla will testify to meetings and communications that occurred with Le Papillon during the time the contract was made and subsequent to the discovery of the problems with the fitments.

Mr. Nilla's testimony, coupled with that of Plaintiff's other witnesses will establish all the elements of a prima facie case of each of the claims that Plaintiff brings against Defendant.

    **5.**      **Jordan Rotheiser**
                   **Rotheiser Design, Inc.**
                   **1755 Lake Cook Road-325**
                   **Highland Park, Illinois 60035**

Mr. Rotheiser has been disclosed as an expert in this litigation.  Mr. Rotheiser will testify as to his education, background and work experience.  Mr. Rotheiser will testify as to the facts and conclusions contained in his report of April 1, 2004.  He will testify that Le Papillon was negligent in failing to determine the quality of the mold that produced the fitments before placing its product

in the marketplace.  Mr. Rotheiser will also testify that Le Papillon was negligent in failing to determine the condition of the mold prior to purchasing it and placing its product in the marketplace. Mr. Rotheiser will testify that Le Papillon produced fitments with wide varying retention dimensions from a mold with wide varying core dimensions.

Mr. Rotheiser will also testify that it was impossible for Le Papillon to produce parts within specification due to the wide varying core dimensions of the core pins.  Mr. Rotheiser is also expected to testify that Le Papillon was derelict in creating a new drawing with new fitment specifications without investigating whether the new specification would produce a proper functioning part.  Mr. Rotheiser is expected to testify that Le Papillon's attempt to adjust the design of the mold resulted in an impossible design specification that would have allowed the elimination of the retention of the ball.

Finally, Mr. Rotheiser is expected to testify that Le Papillon was negligent in failing to inform its customers of its knowledge that its product was failing and to further share this information with its consultant.

Mr. Rotheiser will testify in accordance with his April 1, 2004 report, attached exhibits and the documents he relied upon in preparing the report.  On rebuttal, he will testify concerning inaccuracies in Defendant's experts' conclusions.

      **6.**    **Ronald Schumitz**
             **Craig M. Ferguson & Co., Inc.**
             **Holly Pond Plaza**
             **1281 Main Street**
             **Stamford, Connecticut 6902**

Mr. Schumitz has been disclosed as an expert in this litigation. He will testify as to his

education, background and work experience. Mr. Schumitz will testify concerning his history with Plaintiff as their broker and as to Plaintiff's insurance needs. Mr. Schumitz will testify as to the facts and conclusions contained in his report of April 1, 2004. Mr. Schumitz will testify that Parfums de Coeur, Ltd. was unable to procure commercial general and excess liability insurance at a reasonable price in a timely manner as a result of the numerous claims relating to the roller-ball fitments in its Glitter Roll-On products. Mr. Schumitz will testify that Parfums de Coeur, Ltd. was considered a favorable risk prior to its experience with the numerous claims relating to the roller-ball fitments in its Glitter Roll-On products. Mr. Schumitz will also testify that the Travelers Insurance Company would have continued its insurance program in full, including general and excess liability insurance, with Parfums de Coeur, but for the numerous claims relating to the roller-ball fitments in its Glitter Roll-On products.

Mr. Schumitz will testify that as a result of the numerous claims relating to the roller-ball fitments in its Glitter Roll-On product, Parfums de Coeur was only able to obtain lesser coverage at a substantially increased price than the market would have otherwise dictated.

Mr. Schumitz will testify that Parfums de Coeur's increases in insurance premiums would have been consistent with market conditions, but for the numerous claims relating to the roller-ball fitments in its Glitter Roll-On products.

Mr. Schumitz will testify in accordance with his April 1, 2004 report, and the documents he relied upon in preparing the report. On rebuttal, he will critique the testimony of Defendant's expert.

**7.     Daniel Labonte**
**6475 Fabre Street**
**Charlesbourg G1H6J7, Quebec**

Mr. Labonte was the general manager of Optiplast, Inc. during the time in which Optiplast stored and performed the molding of the fitments on behalf of Le Papillon. Mr. Labonte will testify regarding Optiplast's performance of the molding operation on behalf of Le Papillon; its subcontracting of some of the molding work; and its quality inspections and procedures. Mr. Labonte will also testify regarding his meetings and communications that occurred with Le Papillon including the nature and extent of the efforts undertaken by Optiplast to correct complaints Le Papillon had issued regarding the failure of the fitments to retain the roller balls. Mr. Labonte will testify regarding the facts and circumstances that lead to the movement of the mold from Optiplast to Lumelite. In the event that he cannot appear at trial, Mr. Labonte will testify through his deposition.

**8.     Raymond Severa**
**3172 South Windsor Court**
**Westlake, Ohio 44145**

Mr. Severa is an employee of Bonne Bell. He will testify regarding the facts and circumstances surrounding the problem Bonne Bell experienced with Defendant's fitment; his education and background; his job functions at Bonne Bell; and his business dealings with Le Papillon and Kaufman Container. Mr. Severa will testify regarding his subsequent involvement after the discovery of problems with the fitment. He will testify regarding meetings and communications that occurred with Le Papillon and Kaufman subsequent to the discovery of the problems with the fitments. He will testify concerning efforts to identify why fitments were failing, and his efforts and the efforts of others to find a solution to the problem. In the event that he cannot appear at trial, Mr.

Severa will testify through his deposition.

    **9.    Michael Cecci or Cheryl Chrisman**
           **Parfums de Coeur Ltd.**
           **237 Laracy Drive**
           **Huntsville, Alabama 35824**

Either Mr. Cecci or Ms. Chrisman will testify regarding their education and background and their job functions at Parfums De Coeur. Either Mr. Cecci or Ms. Chrisman will testify regarding record keeping at Plaintiff's warehouse with respect to the receipt of goods from vendors and will testify regarding records received from Knowlton packaging that identify the source of the defective fitments as those sold by Defendant. They will also testify concerning returns, refilling of packages and efforts to mitigate damages by retrofitting fitments.

    **10.    Patricia Hill**
           **25 Knoll Drive**
           **Hamden, Connecticut 06518**

Ms. Hill, an underwriter at the Travelers Insurance Company, may be called to testify regarding the facts and circumstances surrounding Traveler's failure to renew Plaintiff's insurance program. Ms. Hill will testify that the Parfums de Coeur account was a desirable and profitable account, and that their insurance would have been renewed but for the roller ball claims. Depending on the dates of trial, if Ms. Hill is not able to testify in person, portions of her deposition will be read into the record.

    **11.    Barry Dyball**
           **42 Pine Street**
           **Knowlton, Quebec**

Mr. Dyball will testify regarding their education and background and his job functions at

Knowlton Packaging.  Mr. Dyball will testify regarding Knowlton's filling procedures, testing performed on the fitments, and efforts to find solutions with the ball retention problem.  Mr. Dyball will testify regarding meetings and communications that occurred with Le Papillon and its representatives.  He will testify concerning efforts to identify the fitments that had failed, why fitments were failing, and his efforts and the efforts of others to find a solution to the problem.  Mr. Dyball will also testify concerning Knowlton's record keeping procedure and tracking of component parts.  Mr. Dyball will testify concerning the subject matter that was covered in his deposition.  In the event that he cannot appear at trial, Mr. Dyball will testify through his deposition.

**B.     Defendant's Witnesses**

Please see Defendant's Joint Trial Submission.

**10.    EXHIBITS**

**Potential Exhibits to be Offered by Plaintiff**

1.      Parfums de Coeur Purchase Order No. 110330 dated February 16, 2001 for the order of 1,400,000 fitments.

2.      Parfums de Coeur Purchase Order No. 110330 REV 1 dated March 23, 2001, requesting production of 450,000 fitments starting in late June/early July.

3.      Parfums de Coeur Purchase Order No. 110330 REV 2 dated July 6, 2001, increasing quantity ordered   to 1,650,000.

4.      Parfums de Coeur Purchase Order No. 110330 REV 3 dated July 17, 2001, increasing quantity ordered to 1,750,000.

5.      Fitment drawing labeled Covipak dated July 7, 2001.

6.      Fitment drawing labeled "Gel 13 juin 2001."

7.      Fitment drawing labeled Le Papillon dated October 18, 2001.

8.      Facsimile dated April 3, 2001 from Randy Wheaton to Luc Duchesne.

9.      Memorandum received on June 11, 2001 by Ken Primer from Mark Rosso including copies of blueprints for the bottle, cap, retainer and ball.

10.     E-mail dated June 14, 2001 from Judi Snyder to Ken Primer re: balls were disjointed from sockets.

11.     Bonne Bell Pressure Testing Results dated July 7, 2001.

12.     Handwritten notes of Therese Butler-Melick dated July 9, 2001 re: problems with fitments.

13.     Facsimile dated July 10, 2001 from Timothy Hagerty to Luc Duchesne re: problems with roller balls coming out of the fitments.

14.     Facsimile dated July 10, 2001 from Timothy Hagerty to Guy Mercier re: increase in Parfums purchase order.

15.     E-mail dated July 10, 2001 from Therese Melick to Bonne Bell employees re: roll on bottles.

16.     E-mail dated July 11, 2001 from Therese Melick to Bonne Bell employees re: Roll on update.

17.     E-mail dated July 11, 2001 from Therese Melick to Ray Severa with handwritten notes re: Roll on bottles.

18.     Kaufman Container Quality Problem Report dated July 16, 2001.

19

19.     Handwritten notes dated July 18, 2001 containing pressure test results.

20.     Facsimile dated July 26, 2001 from Tim Hagerty to Guy Mercier.

21.     3 pages of handwritten of Therese Melick dated August 2001.

22.     3 page facsimile dated August 2, 2001 from Randy Wheaton to Mark Rosso re: Butterfly Roller Balls.

23.     E-mail dated August 7, 2001 from Therese Melick to Bonne Bell employees re: Roll on Shiner update.

24.     Facsimile of letter dated August 8, 2001 from Randy Wheaton to Dave Jones re: Glitter Roll-On Butterfly Packages.

25.     Bonne Bell Stability Test Form dated August 6-7, 2001.

26.     Bonne Bell Rejection Report dated August 10, 2001.

27.     E-mail dated August 17, 2001 from Therese Melick to Sara Higgins, Debbie Stefancin and Mark Rosso re: Fitments arriving today at BB.

28.     E-mail dated August 23, 2001 from Therese Melick to Mark Rosso and Amy Duncan re: Roll on fitment – sorting.

29.     E-mail dated August 23, 2001 from Judi Snyder to Sara Higgins re: Cavity numbers of "bad."

30.     E-mail dated August 24, 2001 from Sara Higgins to Judi Snyder re: Roll On Fitment information.

31.     E-mail dated August 28, 2001 from Therese Melick to Amy Duncan re: Roll on shiner fitments.

20

32.     E-mail dated August 29, 2001 from Therese Melick to Amy Duncan re: Roll on fitment update.

33.     E-mail dated August 31, 2001 from Therese Melick to Bonne Bell and Kaufman Container personnel re: Roll on fitment update.

34.     Facsimile dated September 4, 2001 from Tim Hagerty to Luc Duchesne and Daniel Labonte re: samples.

35.     E-mail exchange dated September 10, 2001 between Raymond Severa, Amy Duncan, Bob Smaldino and Judi Snyder re: R/O Shiner Fitment Samples.

36.     E-mail exchange dated September 12, 2001 between Jan Thomson, Julie Shlepr, Nancy Pampush, et al. re: Roll-On Shiner.

37.     E-mail dated September 14, 2001 from Sara Higgins to Tim Hagerty re: Bonne Bell/Optiplast fitment issue.

38.     Bonne Bell Ball Fitment Charge Back dated October 11, 2001.

39.     Handwritten notes of James Storar dated October 11-12, 2001.

40.     E-mail dated October 16, 2001 from Barry Dyball to Randy Wheaton et al. al, re: Update on P.D.C. Glitter Roll-On.

41.     Facsimile dated October 23, 2001 from James Storar to Watson Warriner re: print.

42.     Facsimile dated October 24, 2001 from James Storar to Watson Warriner re: core pin drawing.

43.     Facsimile dated November 6, 2001 from James Storar to Watson Warriner re: update.

44.     Facsimile dated November 19, 2001 from James Storar to Watson Warriner re:

21

update.

45.    Letter dated November 21, 2001 from Jeff Gross to Watson Warriner re: Bonne Bell-Roll On Package Liability.

46.    Facsimile dated December 9, 2001 from James Storar to Watson Warriner re: current status.

47.    Letter dated December 14, 2001 from Jeff Gross to Watson Warriner re: accounts payable.

48.    E-mail exchange dated December 17, 2001 from Barry Dyball to Denis Schinck, Randy Wheaton, et al. re: LDPE & MDPE roller ball plugs testing. (00143)

49.    Facsimile dated January 10, 2002 from Luc Duchesne to Watson Warriner re: samples.

50.    Facsimile dated January 16, 2002 from Luc Duchesne to Watson Warriner re: samples.

51.    Mailing label dated January 16, 2001 from Optiplast to Parfums de Coeur with handwritten notes of Randy Wheaton re: samples.

52.    Letter dated January 28, 2002 from Tim Hagerty to Daniel Labonte re: Movement of Roll On Fitment Mold & Roller Balls.

53.    E-mail dated February 2, 2002 from Daniel Labonte to Tim Hagerty re: Roll-on fitment mold.

54.    E-mail dated February 6, 2002 from Tim Hagerty to Daniel Labonte re: Roll-on fitment mold.

55.     E-mail dated February 8, 2002 from Daniel Labonte to Tim Hagerty re: Roll-on fitment mold.

56.     Letter dated February 8, 2002 from John J. Nilla to Watson Warriner re: Butterfly Bottle Ball Fitment—Retention Problem.

57.     Lumelite Variables Control Chart dated February 20, 2002.

58.     Facsimile dated March 13, 2002 from Barry Dyball to Randy Wheaton re: Pressure Testing Results.

59.     Facsimile dated March 18, 2002 from Michael Shepherd to Randy Wheaton re: modifications.

60.     Facsimile dated March 19, 2002 from Michael Shepherd to Randy Wheaton re: cavity configuration.

61.     Parfums de Coeur Purchase Order No. 120404 dated March 19, 2002 for the purchase of the 24 cavity mold.

62.     Facsimile dated March 19, 2002 from John J. Nilla to Watson Warriner re: roller ball assembly.

63.     Facsimile dated March 21, 2002 from Tim Hagerty to Jack Nilla re: invoice.

64.     Le Papillon check dated April 25, 2002 and accompanying memorandum from Watson Warriner. (KC75-76)

65.     Notifications dated April 30, 2002 from Travelers Property Casualty re: policy cancellation.

66.     Letter dated May 6, 2002 from John J. Nilla to Watson Warriner re: costs.

23

67.     E-mail dated May 16, 2002 from Elaine Slocum to Ed Kaminski re: Markets (708-709)

68.     Parfums De Coeur, Ltd. Insurance Proposal prepared by Craig M. Ferguson & Co., Inc.

69.     Undated report from James Storar to Watson Warriner.

70.     Undated Handwritten notes of James Storar.

71.     Invoice dated December 26, 2002 from USI for insurance coverage.

72.     Check dated December 26, 2002 for $237,169.92 for payment of insurance premiums.

73.     Knowlton production records.

74.     Le Papillon Ltd. Purchase Order No. 2436B1 dated February 27, 2001

75.     Le Papillon Ltd. Purchase Order No. 2436B1, Change Order 1 dated February 27, 2001.

76.     Le Papillon Ltd. Purchase Order No. 2436B1, Change Order 2 dated February 27, 2001.

77.     Le Papillon Ltd. Purchase Order No. 2436B1, Change Order 3 dated February 27, 2001.

78.     Le Papillon Ltd. Purchase Order No. 25996B2, dated May 21, 2001.

79.     Le Papillon Ltd. Purchase Order No. 2648B2, dated June 11, 2001.

80.     Le Papillon Ltd. Purchase Order No. 2663B2, dated June 25, 2001.

81.     Le Papillon Ltd. Purchase Order No. 2663B2, Change Order 1, dated June 25, 2001.

82.     All deposition exhibits.

24

83.     Defendant's June 6, 2003 Responses to Plaintiff's Interrogatories and Requests for Production.

84.     Defendant's April 6, 2004 Answers to Plaintiff's Interrogatories and Requests for Production dated February 3, 2004 re: Counterclaim.

## 12.     POTENTIAL DEPOSITION TESTIMONY

### A.     Plaintiff's Witnesses

1.     Timothy Hagerty

Pages: 3-45, 47-57, 59-63, 65-72, 74-105, 112-121, 123, 125-129, 143-150,153-178 & 182-193

2.     Mark Rosso

Pages: 3-5, 9-21, 23-24, 26-28, 30-47, 49-74, 77-80, 82-84, 95-105, 107-108, 110-151, 154-165, 167-170, 172-179 & 184-189.

3.     Watson Warriner

Pages: 4-7, 9-16, 18-23, 25, 27-28, 29-35, 37-42, 57-65, 70-85, 87-89, 95-98, 102-104, 118-123, 126-127, 129-130, 134-140 & 151-153.

4.     Luc Duchesne

Pages: 4, 6-10, 17-23, 25-53, 55-62, 72-77, 79-92, 94-102, 123-131, 142-143, 147-148 &155.

5.     James Storar

Pages:  5-10, 12-15, 17-19, 21-22, 26-29, 32-37, 43-48, 51-52, 54, 56-84, 87-88, 90-93, 97-98, 101-104, 106-111, 113-116, 118-120, 123-124, 127-131, 135-147, 149-151, 153-157, 169-175, 181-182, 184-190 7 192-193.

6.     Therese Butler-Melick

25

Pages: 6, 8, 10-13, 15-23, 25-27, 29, 31-40, 42-49, 52-56, 58-60, 70, 71, 72, 74, 75, 78-81, 88-89, 91-94, 96-97, 100-107, 114-115, 121-123, 127, 131-133, 138-140, 145-147, 156, 163-165, 173-180, 182-198, 203-207, 211-214.

      7.      Daniel Labonte (Deposition taken in Canada—transcript not yet available)  Plaintiff will supplement when transcript is received.

      8.      Guy Mercier (Deposition taken in Canada—transcript not yet available)  Plaintiff will supplement when transcript is received.

      9.      Ray Severa

Entire transcript if witness does not testify in person.

      10.      Joseph Walter Pietryka

Pages: 4, 7-10, 29-33, 47-53, 105-114, 119, 121-123 & 125-129.

      11.      Michael Shepherd

Pages: 4-6, 9-11, 19-32, 34-35, 37, 39, 42-43, 45-46, 48-49, 65-69, 71-75, 78-79, 82-88, 96-97 & 99-104.

      12.      Robert Rosso

Entire transcript.

      13.      Barry Dyball

Entire transcript if witness does not testify in person.

**13.    REQUESTS FOR JURY INSTRUCTION**

Not applicable.

**14.    ANTICIPATED EVIDENTIARY PROBLEMS**

Plaintiff does not anticipate any evidentiary issues at this time, but respectfully requests the Court for permission to reserve for trial all objections regarding the listed witnesses' testimony and proposed exhibits.

**15.    PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

1.    Plaintiff, PARFUMS DE COEUR, LTD. was and is a corporation duly organized and existing and qualified to do business in the State of Connecticut with a principal place of business in Darien, Connecticut.

2.    Defendant, LE PAPILLON LTD. is a Delaware corporation with a main business address of 12 Albany Street, New Brunswick, NJ 08901 and which does business in the State of Connecticut.

3.    Plaintiff is a company engaged in the business of producing perfume fragrances including fragrances that it packages in Glitter Roll-On bottles for retail sale.

4.    At all relevant times, Defendant was engaged in the business, among other things, of producing and selling assembled ball and collar fitments for use with bottles.

5.    PARFUMS' Glitter Roll-On bottles are topped with two part dispensing mechanisms consisting of a roller ball and collar fitment (the "fitments") that enable consumers to apply the fragrances.

6.    Defendant purchased the molding tool that produces the roller ball fitment in November 200 in connection with a bankruptcy proceeding of Covipak, Inc. a Canadian company that previously supplied Plaintiff with its fitments.

27

7.     At the time of Defendant's purchase of the mold, it was located, and remained, at Optiplast, Inc. ("Optiplast"), in Saint-Damien Quebec during the relevant time.

8.     PAPILLON owned the mold throughout the entire relevant time.

9.     On or about February 16, 2001, Plaintiff entered into a contract with PAPILLON pursuant to various purchase orders, whereby Plaintiff purchased from PAPILLON, and PAPILLON sold and supplied to Plaintiff, the fitments to be used on top of its Glitter Roll-On bottles.

10.    The terms and conditions contained on the back of the purchase order were an integral part of the agreement.

11.    Pursuant to the purchase order, PAPILLON expressly warranted that the fitments were "of merchantable quality, conforms to specifications and is suitable for the Purchaser's intended uses and purposes in the ordinary course of business."

12.    Relying on Defendant's contractual obligations and representations as well as the implied warranties of merchantability and fitness for particular use, PARFUMS used the fitments it purchased from PAPILLON for its intended purposes as the dispensing mechanism for its Glitter Roll-On products.

13.    The fitments sold and supplied by Defendant were subject to the implied warranty of merchantability and implied warranty for a particular purpose.

14.    Defendant subcontracted the molding operation to Optiplast who performed the molding operation itself and, at times, further subcontracted the molding operation to another molder unbeknownst to Plaintiff.

15.    Defendant failed to have any maintenance or quality control measures in place in its

28

manufacturing process of the fitments.

16.     Defendant failed to oversee the actions of its molder in maintaining the mold and producing the fitments.

17.     Defendant did not have the necessary knowledge to implement appropriate measures to insure the quality of the mold.

18.     Defendant never inspected the mold to determine its quality or condition prior to purchasing the mold.

19.     Defendant never inspected the mold to determine its quality or condition prior to selling fitments to Plaintiff.

20.     Defendant was derelict in not determining the quality of the mold prior to placing its product in the marketplace.

21.     Defendant was derelict in not determining the condition of the mold prior to purchasing it and placing its product in the marketplace.

22.     The only measure undertaken by Optiplast to ensure the quality of the fitments was to perform a visual inspection of the parts it produced which failed to discover the defects in the fitments.  The parts sold to Plaintiff were never inspected by Defendant or their agents to insure that they were merchantable or conformed to specifications.

23.     Beginning on or about June 2001, PARFUMS began receiving numerous complaints and claims from consumers of its Glitter Roll-On products that the roller ball in the fitments supplied by PAPILLON would burst out of the fitment when pressure was applied to the bottle.

24.     Plaintiff did not know the extent or the cause of the problem with the fitments at this

time nor did it know the extent of any injuries to customers.

25.     In or about late June/early July 2001, PAPILLON received complaints from another one of its customers, Kaufman Containers ("Kaufman"), indicating that the roller balls were coming out of the fitments during the assembly process and were also found loose and disengaged from the fitments in the bins where they were being assembled..

26.     Kaufman's customer, Bonne Bell, discovered that the fitments failed to retain the roller ball.

27.     The fitments failed to retain the roller ball due to a defect in the fitments.

28.     Defendant knew that the fitments being produced were inconsistent and often failed to meet specifications.

29.     Bonne Bell determined that the fitments provided by Defendant were inconsistent and failing in large numbers.

30.     After receiving notification from Kaufman of the fitment's failures, Defendant began to investigate the problems Kaufman's customer, Bonne Bell, was experiencing with the fitments.

31.     Defendant knew that there were problems with certain cavities of the mold that produced the fitments.

32.     Despite possessing the knowledge of the widespread problems Kaufman and Bonne Bell experienced, PAPILLON kept this knowledge and the extent of the problem secret from PARFUMS.

33.     Defendant admitted to Kaufman that the problems with the fitments were due to "molding problems."

34.     After Plaintiff received complaints, it began to investigate the situation to try to determine its cause.

35.     Plaintiff sought the assistance of Defendant in connection with its efforts to investigate the failure of the fitments.

36.     In early August 2001, Plaintiff sent Defendant a case of its butterfly package.

37.     On or about August 2, 2001, PARFUMS notified PAPILLON that the balls were coming out of the fitments and consumers had been injured.

38.     On or about August 2, 2001, Plaintiff sent a facsimile to Defendant that indicated the results of an inspection report performed by Plaintiff's filler regarding the pressure at which the ball were expelled from the fitment.

39.     The results of the testing done by Plaintiff's filler showed widely inconsistent ball retention in the fitments supplied by PAPILLON.

40.     Plaintiff requested Defendant to provide assistance in determining the source of the problem with the fitments failing to retain the roller ball and a solution to the retention problem.

41.     Defendant never responded truthfully and kept their knowledge secret while purporting to minimally assist Plaintiff by providing sample fitments five months later without ever disclosing their knowledge of the source of the problem.

42.     Defendant's acts were calculated to enable them to sell additional fitments to Plaintiff while hiding the known defect in its product.

43.     Despite possessing the knowledge that PARFUMS was experiencing a similar problem as Kaufman and Bonne Bell, PAPILLON kept this knowledge and the extent of the problem

secret from PARFUMS.

44.　　After receiving the sample butterfly bottles from Plaintiff, Defendant responded by allegedly taking the bottles out of their case, holding them upside down, and, when the roller ball did not fall out, concluded that there was no problem.

45.　　Despite possessing the knowledge of PARFUMS' containers which PAPILLON alleges in defense of this action were not suitable for use with the fitments, PAPILLON kept this knowledge secret from PARFUMS at this time.

46.　　After repeated failures to correct the problems Kaufman experienced with the fitment, Defendant engaged the services of a consultant to examine its mold and molding process.

47.　　Mr. Storar, the Defendant's consultant, traveled to Optiplast in order to examine the mold.

48.　　Optiplast is located in Quebec and its principals speak French only.

49.　　Defendant communicated with Optiplast through Luc Duchesne as Defendant did not speak French.

50.　　Mr. Storar was accompanied by Luc Duchesne in his visit to Optiplast.

51.　　Mr. Duchesne was an agent of Defendant and assisted Defendant in dealing with Optiplast.

52.　　Mr. Storar found that a sample of the fitments he examined were out of specification.

53.　　Mr. Storar determined that the mold core pins which make the fitments were very inconsistent.

54.　　Mr. Storar determined that two of the core pins were below specification.

55.    Due to the inconsistencies in the cavities of the mold, Defendant could not produce consistent parts.

56.    Defendant was derelict in producing parts with widely varying retention dimensions from a mold with widely varying core dimensions resulting in parts with wide variances in ball retention strength.

57.    Defendant abdicated all quality assurance responsibilities to its molder.

58.    Optiplast's general manager had no prior experience of any sort in molding plastic parts and had no experience in quality control.

59.    Optiplast has insufficient quality control procedures to identify the defective parts.

60.    Despite possessing its knowledge of Kaufman and Bonne Bell's failure with the fitments and the findings of its consultant, Defendant kept this information secret from PARFUMS.

61.    Mr. Storar made a new core pin drawing to improve the fitments and ordered that new pins be made.

62.    The Covipak drawing contained the specifications for the fitment sold to Plaintiff.

63.    The fitments sold to Plaintiff failed to conform to the specifications contained in the Covipak drawing.

64.    Defendant was aware of Plaintiff's specifications.

65.    Defendant acknowledged the existence of specifications in its counter-claim.

66.    Defendant was aware that the Covipak drawing represented Plaintiff's specifications.

67.    Defendant failed to provide Optiplast with the appropriate specifications for the fitment sold to Plaintiff.

68.    Defendant also discovered that there were problems with the molding process used by its molder.

69.    From the time Defendant first learned of Kaufman and Bonne Bell's problems with the fitments, Optiplast made continual changes to the molding process in an attempt to improve the problem with ball retention.

70.    Defendant never disclosed these problems to Plaintiff or the changes to the molding processes being made.

71.    Defendant ultimately lost the Kaufman and Bonne Bell business and paid Kaufman $25,612.44 as a final settlement of open invoices and debits taken by Kaufman as a result of Defendant's failure to provide an acceptable, functional and quality fitment.

72.    Defendant kept its knowledge about the molding problems experienced by its molder secret from Plaintiff.

73.    Defendant was derelict in not informing Plaintiff of the problems it was experiencing with the fitments.

74.    Despite not revealing its knowledge of the problems to Plaintiff, Defendant's representatives professed that they were making changes to address Plaintiff's concerns.

75.    In early January 2002, Defendant had new sample fitments sent to Plaintiff.

76.    The samples provided by Defendant were worse than previous fitments and failed to retain the roller ball consistently.

77.    On January 9, 2002, Plaintiff met with Defendant's President, Watson Warriner, at its office.

34

78.     At this time, Mr. Warriner admitted knowledge of similar problems with the fitment at another one of his customers that were caused by Defendant's molder.

79.     At the January 9, 2002 meeting, Mr. Warriner admitted that they were responsible for the defective fitments, and that he would stand behind his product, would replace the fitments, pay for any rework of the product and would be responsible for all damages.

80.     Although PAPILLON had been contemplating moving the mold to the United States since at least November 2001, on or about January 28, 2002, Defendant requested Optiplast to ship the mold to another molder located in the United States.

81.     On or about February 6, 2002, Defendant advised Optiplast that it needed to move the mold as a result of Optiplast's molding problems.  They then moved the mold to Lumelite Plastics in Pawling, New York because they were more qualified.

82.     Defendant breached its contract with Plaintiff, and breached its express and implied warranties by failing to provide a fitment that was fit for its normal use as a result of the defect that caused the roller ball to fall out of the fitment.

83.     Defendant breached its contract with Plaintiff, and breached its express and implied warranties by failing to provide a fitment that was acceptable in the trade due to the defect that caused the roller ball to fall out of the fitment.

84.     Defendant breached its contract with Plaintiff, and breached its express and implied warranties by failing to provide a fitment that was not suitable for Plaintiff's intended uses and purposes in the ordinary course of its business due to the defect that caused the roller ball to fall out of the fitment.

35

85.     Defendant breached its contract with Plaintiff, and breached its express and implied warranties by failing to provide a fitment that conformed to specifications due to the defect that caused the roller ball to fall out of the fitment.

86.     Pursuant to the hold harmless provision in the purchase orders, Defendant expressly and impliedly contracted to indemnify Plaintiff against all claims, judgments, damages, incidental or consequential, loss or expense, including reasonable counsel fees resulting from its failure to satisfy its warranties.

87.     Defendant had a duty to disclose the information it had about the problems with the mold and the fitments.

88.     Defendant's failure to disclose all information regarding its Mechanisms is immoral, unethical, oppressive, unscrupulous, and offends public policy.

90.     Defendant's failure to disclose said information resulted in substantial injuries being caused to consumers.

91.     Defendant's failure to disclose said information to Plaintiff was deceptive and unfair, and amounted to a deceptive trade practice.

92.     Plaintiff would not have faced claims by consumers if not for the defective fitment. Prior to these claims, Plaintiff had an exemplary record for product safety and an exceptional claim history.

93.     Plaintiff's product and general liability insurance was cancelled in the spring 2002 as a result of the increased claims it suffered because of the defective fitment sold by Defendant.

94.     Plaintiff suffered increased insurance costs and will continue to suffer increased

insurance costs as a result of the increased claims it suffered because of the defective fitment sold by Defendant.

## PLAINTIFF'S PROPOSED CONCLUSIONS OF LAW

### FIRST COUNT (BREACH OF CONTRACT)

In order to maintain an action for breach of contract, a plaintiff must prove: 1) the existence of a contract or agreement; 2) a breach of that contract or agreement; and 3) damages resulting from the breach. See, e.g., Chem-Tek, Inc. v. General Motors Corp., 816 F.Supp. 123, 131 (D.Conn. 1993).

Plaintiff and Defendant entered into various purchase orders in which Defendant agreed to provide a part that was "of merchantable quality, conforms to specifications and is suitable for the Purchaser's intended uses and purposes in the ordinary course of business." Defendant breached its contract by failing to supply a part that met these conditions.

### SECOND COUNT (BREACH OF EXPRESS WARRANTY)

The elements for a claim for breach of warranty are: (1) existence of the warranty; (2) breach of the warranty; (3) damages proximately cause by the breach. See, e.g., Omega Engineering, Inc. v. Eastman Kodak Co., 30 F.Supp.2d 226, 246 (D.Conn. 1998) (citations omitted). In order to make a claim for an express warranty, a contract must exist between the parties. Words must be present that indicate an affirmation of fact or promise made by the seller to the buyer which relate to the goods and becomes part of the basis for the bargain. Id. Furthermore, there must be justifiable reliance upon the statement made. Danise v. Safety-Kleen Corp., 17 F.Supp.2d 87 (D.Conn. 1998).

Plaintiff and Defendant entered into various purchase orders in which Defendant agreed to

provide a part that was "of merchantable quality, conforms to specifications and is suitable for the Purchaser's intended uses and purposes in the ordinary course of business."  Defendant breached its contract by failing to supply a part that met these conditions.

**THIRD COUNT (IMPLIED WARRANTY OF MERCHANTABILITY)**

To recover under a claim for implied warranty of merchantability, a plaintiff must prove (1) that a merchant sold goods, (2) which were not merchantable at the time of the sale, and (3) injury and damages to the plaintiff or his property, (4) were caused approximately and in fact by the defective nature of the goods, and (5) that notice was given to the seller of the injury. Omega Engineering, Inc. v. Eastman Kodak Co., 30 F.Supp.2d 226, 246 (D.Conn. 1998).

"Goods to be merchantable must be at least such as (a) pass without objection in the trade under the contract description; and (b) in the case of fungible goods, are of fair average quality within the description; and, (c) are fit for the ordinary purpose for which such goods are used; and (d) run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and (e) are adequately contained, packaged, and labeled as the agreement may require; and, (f) conform to the promises or affirmations of fact made on the container or label if any." Conn. Gen. Stat. § 42a-2-314(2).  Defendant breach its implied warranty of merchantability by failing to provide Plaintiff with a part that was acceptable in the trade and fit for its ordinary purposes.

**FOURTH COUNT (IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR USE)**

Two requirements must be met to satisfy a claim for implied warranty of fitness.  A plaintiff must show (1) that the buyer relies on the seller's skill or judgment to select or furnish suitable

goods; and (2) the seller at the time of contracting has reason to know the buyers purpose and that the buyer is relying on the seller's skill or judgment. Conn. Gen. Stat. § 42a-2-315; see also Omega Engineering, Inc., supra. Defendant breached its implied warranty of fitness for a particular use in that Plaintiff relied on Defendant's skill in furnishing a suitable part and that Defendant knew of the Plaintiff's purpose for the part, but failed to provide an appropriate part.

**FIFTH COUNT (CONTRACTUAL INDEMNIFICATION)**

In order to prevail on a contractual indemnification claim, a party must show either an express or implied contractual right to indemnification. Fifield v. South Hill Ltd. Partnership, 20 F.Supp.2d 366 (D.Conn. 1998). Unambiguous language of indemnity clause should be given effect as expressing the intent of the parties. Laudano v. General Motors Corp., 34 Conn.Sup. 684 (Conn. Super. 1977). The language contained within the purchase orders created a contractual right to indemnification.

**SEVENTH COUNT (CONNECTICUT UNFAIR TRADE PRACTICES ACT)**

Under the Connecticut Unfair Trade Practices Act, a court considers numerous factors in determining that a practice is unfair including: 1) the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common-law, or otherwise; 2) whether it is immoral, unethical, oppressive or unscrupulous; 3) whether it causes substantial injury to consumers, competitors or other businessmen. See, e.g., Journal Publishing Co., Inc. v. The Hartford Courant Co., 261 Conn. 673, 695 (2002). In order to prevail on a CUTPA claim, a plaintiff "[f]irst, must establish that the conduct at issue constitutes an unfair or deceptive trade practice. . . . [and] second, he must present evidence providing the court

with the basis for a reasonable estimate of the damages suffered." <u>Jacques All Trades Corp. v. Brown</u>, 42 Conn. App. 124, 130 (1996). Defendant failed to advise Plaintiff that the fitment could not be used on Plaintiff's package despite having knowledge of the same. Defendant's failure to advise Plaintiff of its knowledge that other customers experienced an identical problem with its fitment offends public policy, was immoral, unethical, oppressive or unscrupulous and resulted in further injury to Plaintiff and its customers. Further, Defendant's knowledge of persistent problems with its molder, Optiplast, and it's discovery by its consultant that there were widespread problems with the mold it owned were never disclosed to Plaintiff. The failure to make this disclosure caused substantial injury to Plaintiff and its customers.

**COUNTERCLAIM OF THE DEFENDANT LE PAPILLION, LTD.**
**DATED SEPTEMBER 25, 2002**

The defendant alleges in paragraph 16 of its counterclaim dated September 25, 2002 that any injuries sustained by users of the glitter-critter products are entirely attributable to the plaintiff's negligent failure to determine whether the roller-ball assemblies were suitable for use in flexible containers. The defendant goes on to allege in paragraph 17 that it is entitled to a declaration that plaintiff must indemnify it for any costs and expenses that it will incur as a result of these injuries, including, but not limited to, indemnification for any damages and/or legal fees which it may incur in any lawsuit stemming from these injuries and any consequential damages, including any increased insurance costs.

The plaintiff, Parfums de Coeur, Ltd. filed contention interrogatories with respect to these allegations dated February 3, 2004, which contention interrogatories were answered by the

defendant Le Papillion by way of its answers dated April 6, 2004.

Le Papillion specifically responded to the contention interrogatories directed to its claim for damages as set forth in paragraph 17 of the counterclaim that it had not incurred any costs or expenses to date, but may incur some in the future. The defendant Le Papillion further answered that it had not determined whether its insurance costs have increased, that it is not aware of any consequential damages sustained as of the date of the answering of the interrogatories, and that it has not paid any amount in damages or legal fees in lawsuits for injuries arising out of the use of the roller-ball assemblies.

The defendant Le Papillion has not supplemented these answers. Furthermore, the defendant Le Papillion did not file a damage analysis with respect to the counterclaim. For the foregoing reasons, the defendant Le Papillion is not entitled to recover on the counterclaim as a matter of law, as the defendant Le Papillion has not disclosed any damages on the counterclaim.

**16.    TRIAL TIME**

Counsel anticipates that the trial will last five to seven days.

**17.    FURTHER PROCEEDINGS**

The Parties participated in a full day mediation on October 14, 2004. Also present at the mediation were representatives of the plaintiff in the Charter Oak Fire Insurance Company and the Phoenix Insurance Company v. Le Papillon, Ltd., Civil Action No. 3:04 CV 0359 (RNC) pending before this Court (the "related action").

The Parties believe that significant progress was made at the mediation toward the settlement of the case. Specifically, a partial settlement was reached between the plaintiff and the defendant in

the related action and a final settlement is expected.  The Parties also made progress in the settlement of this action, and believe that settlement is possible with continued discussion.  At the conclusion of the mediation session, Magistrate Judge Martinez expressed her desire to continue the advancement of these discussions via telephone and is scheduling a second mediation session. Magistrate Judge Martinez has been conferring with the parties telephonically and has indicated that an additional mediation session may be scheduled in the first week of November.  Prior to engaging in any additional costs associated with trial preparation, the Parties wish to continue and exhaust these discussions in an effort to resolve this matter.

Magistrate Judge Martinez had ordered the production of documents from the insurer of Defendant on October 12, 2004 after extensive briefing and an "in camera" review, and the deposition of said Company will take place when the documents are produced.  The documents have not been produced despite Magistrate Judge Martinez' Order, and Counsel for Defendant's insurer filed an objection to the ruling on October 22, 2004.  Plaintiff seeks to take the deposition of the representative once the issue has been resolved and to conclude the deposition of Defendant's President.

Plaintiff also requests that if it is successful on its CUTPA claim and indemnity claims then it be permitted to submit affidavits concerning the legal costs and attorneys fees it has incurred in a subsequent proceeding on that issue of damages.

## 18.     ELECTION FOR TRIAL BY MAGISTRATE

The parties do not consent to a trial by a Magistrate Judge.

Respectfully submitted,

THE PLAINTIFF                                    THE DEFENDANT
PARFUMS DE COEUR, LTD.

                                                LE PAPILLON, LTD.

            /s/
By_____      By_____
Richard E. Castiglioni (ct07280)        Michael T. Ryan
Jonathan M. Shapiro (ct24075)           Ryan Ryan Johnson & De Luca
Diserio Martin O'Connor & Castiglioni   80 Fourth Street, P.O. Box 3057
One Atlantic Street                     Stamford, Connecticut 06905-3057
Stamford, CT 06901                      (203) 357-9200
(203) 358-0800

and                                     and

Peter D. Clark                          Robert N. Chan
Clark & Deakin                          Robson Ferber Frost Chan & Essner, LLP
525 Bridgeport Avenue                   530 Fifth Avenue
Shelton, Connecticut 06484              New York, NY 10036
                                        (212) 944-2000